**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

*[Additional Counsel on Signature Page]*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| RICHARD MALTZ, derivatively on behalf of ELECTROCORE, INC., <br><br> Plaintiff, <br><br> vs. <br><br> FRANCIS R. AMATO, GLENN S. VRANIAK, BRIAN POSNER, JOSEPH P. ERRICO, MICHAEL G. ATIEH, NICHOLAS COLUCCI, CARRIE S. COX, THOMAS J. ERRICO, TREVOR J. MOODY, STEPHEN L. ONDRA, MICHAEL W. ROSS, DAVID M. RUBIN, and JAMES L.L. TULLIS, <br><br> Defendants, <br><br> and <br><br> ELECTROCORE, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;** <br> **(2) BREACH OF FIDUCIARY DUTY;** <br> **(3) UNJUST ENRICHMENT;** <br> **(4) WASTE OF CORPORATE ASSETS; AND** <br> **(5) CONTRIBUTION UNDER SECTIONS 11(F) OF THE SECURITIES ACT OF 1933 AND 21D OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> <u>JURY TRIAL DEMANDED</u> |

### <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

# INTRODUCTION

Plaintiff Richard Maltz ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant electroCore, Inc. ("electroCore" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Francis R. Amato ("Amato"), Glenn S. Vraniak ("Vraniak"), Brian Posner ("Posner"), Joseph P. Errico ("J. Errico"), Michael G. Atieh ("Atieh"), Nicholas Colucci ("Colucci"), Carrie S. Cox ("Cox"), Thomas J. Errico ("T. Errico"), Trevor J. Moody ("Moody"), Stephen L. Ondra ("Ondra"), Michael W. Ross ("Ross"), David M. Rubin ("Rubin"), and James L.L. Tullis ("Tullis") (collectively, the "Individual Defendants" and together with electroCore, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of electroCore, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding electroCore, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by electroCore's directors and officers from June 22, 2018 through September 25, 2019 (the "Relevant Period").

2.      electroCore is a commercial stage bioelectronic medicine company that developed non-invasive vagus nerve stimulation therapy, known as "nVNS." The Company's lead product, gammaCore, is used by adults for the treatment of acute pain related to migraines and episodic cluster headaches. By delivering electrical stimulation to the vagus nerve, gammaCore devices are designed to provide relief from headache pain.

3.      In February 2018, the Company's management began acting on plans to take the Company public in an initial public offering (the "IPO"). On February 13, 2018, before the beginning of the Relevant Period, the Company filed a draft registration statement on Form DRS with the SEC. A few months later, on May 21, 2018, the Company filed a registration statement on Form S-1 with the SEC (the "Registration Statement") in connection with the planned IPO. Thereafter, the Company filed three amendments to the Registration Statement on Forms S-1/A with the SEC. The amendments stated that 4,983,332 would be registered in the IPO, at a proposed maximum offering price per share of $16.00. The Registration Statement was declared effective on June 21, 2018.

4.      The Company's stock began trading publicly on the Nasdaq Global Market the next day, on June 22, 2018. Subsequently, on June 25, 2018, the Company filed with the SEC a Prospectus on Form 424B4 (the "Prospectus") in connection with the IPO. The Prospectus formed part of and was incorporated into the Registration Statement (the Prospectus, the Registration Statement, are collectively referred to herein as the "Offering Documents"). Through the IPO, over 5.9 million shares of stock were sold at $15 per share, including additional shares sold through

options exercised by the underwriters to the IPO, and received aggregate net proceeds of approximately $83.4 million,[1] net of underwriter costs and expenses.

5.      The Offering Documents touted the Company's purported "competitive strengths" and gammaCore's supposed advantages in the market while concealing, *inter alia*, that electroCore was actually facing increased competition and pricing pressure and that gammaCore was not thought of as a primary treatment option, but rather a supplemental treatment. Unbeknownst to investors, physicians were hesitant to write prescriptions for a drug that, despite the Company's supposed strong relationships and agreements with commercial payors, was often not covered by insurance carriers. Moreover, the Offering Documents failed to detail the risks facing the Company with respect to, among other things, electroCore's slow sales growth and its need to resort to product discounts, long-term use of voucher programs, and the addition of sales personnel which resulted in an untenable increase in cash burn.

6.      After a successful IPO, despite these realities, through press releases and financial statements filed with the SEC, the Individual Defendants continued to maintain the false claims made in the Company's Offering Documents regarding gammaCore's purported advantages and the Company's supposedly promising future business prospects.

7.      Importantly, the Individual Defendants failed to issue statements correcting the above-referenced material misstatements and omissions in the Offering Documents and the Company's subsequent press releases and SEC filings, until they could no longer conceal the truth about electroCore's performance from the investing public.

---

[1] Initially, upon completion of the IPO, the Company received aggregate net proceeds of approximately $77.7 million after deducting underwriting discounts, commissions and offering costs. However, upon the underwriters' exercising their option to purchase additional shares in the IPO, the Company received aggregate net proceeds of approximately $83.4 million.

8.      On May 14, 2019, the truth began to gradually emerge when the Company issued a press release announcing disappointing financial results for the first fiscal quarter of 2019. Specifically, electroCore reported only $410,000 in net sales and an operating loss of $14.2 million. Moreover, the press release indicated that the Company's agreements with insurance companies contained certain limitations relating to reimbursement for gammaCore.

9.      On this news, the price of the Company's stock fell $1.58 per share, or approximately 29.64%, from $5.33 per share at the close of trading on May 14, 2019, to $3.75 per share at the close of trading on May 15, 2019.

10.     Only two weeks later, on May 29, 2019, the Company issued a press release announcing a revised commercial plan which included, *inter alia*, "significant adjustments" to the deployment of personnel and resources and the "scaling back" of electroCore's clinical development program.

11.     On this news, the price of the Company's stock fell $0.11 per share, or over 5.3%, from $2.06 per share at the close of trading on May 29, 2019, to $1.95 per share at the close of trading on May 30, 2019. Over the following two trading days, the price of the Company's stock continued to fall an additional $0.30 per share, or nearly 15.4%, from $1.95 per share at the close of trading on May 30, 2019, to $1.65 per share at the close of trading on June 3, 2019.

12.     On August 13, 2019, the Company issued a press release announcing "restructuring charges" of approximately $850,000 relating to electroCore's previously announced cost reduction plan. Moreover, the Company announced that it had anticipated cash burn in excess of $7 million and revealed that the insurance coverage restrictions related to reimbursements for gammaCore remained.

13.     On this news, the price of the Company's stock fell $0.17 per share, or over 10%, from $1.56 per share at the close of trading on August 13, 2019, to $1.39 per share at the close of trading on August 14, 2019.

14.     The full truth was finally disclosed on September 25, 2019, when the Company issued a press release revealing that the U.S. Food and Drug Administration ("FDA") had requested "more information and analysis" of the clinical data submitted with electroCore's 510(k) application, which had requested approval of additional label expansions for, *inter alia*, the use of gammaCore as a preventative treatment for migraines.

15.     On this news, the price of the Company's stock fell $0.79 per share, or over 23%, from $3.36 per share at the close of trading on September 24, 2019, to $2.57 per share at the close of trading on September 25, 2019.

16.     Since then, the Company's stock price has continuously traded below $3.00 per share.

17.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to electroCore, willfully or recklessly made and/or caused the Company to make false and misleading statements concerning compliance with relevant financial reporting principles. The false and misleading statements and omissions of material fact failed to disclose, *inter alia*: (1) gammaCore did not benefit from competitive advantages over other treatments for episodic cluster headaches and migraines; (2) in fact, electroCore faced fierce competition due to increasing pricing pressure and a lack of insurance coverage; (3) gammaCore was typically not thought of as a primary treatment for migraines, but rather as a supplemental treatment; (4) electroCore's agreements and relationships with insurance companies and commercial payors were limited; (5) the Company was struggling to obtain insurance coverage for gammaCore; (6) therefore, since

reimbursement would be difficult, physicians were hesitant to prescribe gammaCore; (7) the Company was forced to devote substantial resources to help physicians regarding insurance coverage, thereby increasing electroCore's expenses; (8) electroCore unsuccessfully relied on promotional programs such as its voucher program to increase sales when such programs were having a negative effect on reimbursement by payors, causing the appearance that gammaCore was utilized more often than it was; (9) the foregoing programs required considerable cash outlays which hastened the Company's burn rate, rendering electroCore's commercial approach untenable; (10) the Company's clinical data was insufficient to demonstrate that gammaCore was effective and safe for migraine prevention and the FDA had raised concerns to that effect; (11) consequently, the Company's 510(k) application to the FDA for the use of gammaCore for migraine prevention was unlikely to be approved without, at least, additional data; and (12) the Company's senior leadership including, but not limited to the CEO and CFO, were prepared to step away from electroCore shortly after the IPO. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

18.     During the Relevant Period, when the Individual Defendants breached their fiduciary duties by making and/or causing the Company to make the false and misleading statements discussed herein, the investing public was under a false impression of the Company's business, operations, and financial success.

19.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

20.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

21.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected, among others, the Company and the Individual Defendants, including the Company's former Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), its CFO, and many of its current and former directors to a federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, costing the Company millions of dollars.

22.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

23.     Moreover, one of the Individual Defendants further breached their fiduciary duties by engaging in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact, and before the truth was exposed. Defendant J. Errico sold 100,000 shares of Company stock during the Relevant Period, obtaining proceeds of approximately $535,270.

24.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of one of the directors' liability in the Securities Class Action, of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

25.     As named defendants in the Securities Class Action, the Individual Defendants are further liable to electroCore for contribution under Sections 11(f) of the Securities Act and 21D of the Exchange Act for the Company's liability in the Securities Class Action.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, 17 C.F.R. § 240.14a-9, Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

27.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action.

28.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

29.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

30.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

31.     Plaintiff is a current shareholder of electroCore. Plaintiff has continuously held electroCore common stock since before the beginning of the Relevant Period.

**Nominal Defendant electroCore**

32.     electroCore is a Delaware corporation with its principal executive offices at 150 Allen Road, Suite 201**,** Basking Ridge**,** NJ 07920. electroCore's shares trade on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "ECOR."

**Defendant Amato**

33.     Defendant Amato served as the Company's CEO from July 2016 until September 30, 2019 and as Company director from June 2017 until September 30, 2019. Previously, Defendant Amato served as the Company's Chief Operating Officer from July 2012 through July 2016. According to the Company's Schedule 14A filed with the SEC on April 27, 2020 (the "2020 Proxy Statement"), as of March 15, 2020, Defendant Amato beneficially owned 1,309,310 shares of the Company's common stock, which represented 4.2% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 13, 2020 was $0.54, Defendant Amato owned over $707,027 worth of electroCore stock.[2]

34.     For the fiscal year ended December 31, 2019 (the "2019 Fiscal Year"), Defendant Amato received $3,487,907 in compensation from the Company. This included $1,134,375 in salary, $735,846 in stock awards, $1,569,422 in option awards, and $48,264 in all other compensation. For the fiscal year ended December 31, 2018 (the "2018 Fiscal Year"), Defendant Amato received $1,354,020 in compensation from the Company. This included $446,125 in salary, $250,000 in bonus, $487,500 in option awards, $150,000 in non-equity incentive plan compensation, and $20,395 in all other compensation.

---

[2] The market was closed on Sunday, March 15, 2020.

35.     The Company's Schedule 14A filed with the SEC on April 30, 2019 (the "2019 Proxy Statement") stated the following about Defendant Amato:

> Francis R. Amato, 55, has served as our Chief Executive Officer since July 2016 and as a member of our Board since June 2017. Mr. Amato previously served as our Chief Operating Officer from July 2012 through July 2016. Prior to joining our company, he spent 22 years within the pharmaceutical industry, most recently as Vice President of the Specialty Commercial Operations Group, Global Human Health at Merck & Co. Before joining Merck, Mr. Amato gained extensive commercial experience as Executive Director, Global Business Operations at Schering-Plough, Business Unit Lead, Oncology at Ligand Pharmaceuticals, National Sales Director, Specialty Managed Markets at Pfizer Inc. and National Sales Director, Hospitals at Pharmacia Corporation. Prior to joining the pharmaceutical industry, Mr. Amato was an Infantry Medic in the 82nd Airborne Division of the United States Army. Mr. Amato received his B.A. in Political Science from St. John's University and his Executive MBA from Pepperdine University's Graziadio School of Management. Our Board believes that Mr. Amato's extensive senior management experience in the pharmaceutical and medical device industries, as well as his marketing expertise, qualifies him for service on our Board.

**Defendant Vraniak**

36.     Defendant Vraniak served as the Company's CFO from August 2016 until April 1, 2019.

37.     Pursuant to his employment agreement dated July 25, 2016, Defendant Vraniak was entitled to receive, *inter alia*: (i) a base salary of at least $300,000 subject to increase upon Board approval; and (ii) an annual performance bonus payable at the Board's discretion.

38.     The Registration Statement stated the following about Defendant Vraniak:

> **Glenn S. Vraniak** has served as our Chief Financial Officer since August 2016. Prior to joining our company, from January 2016 to August 2016, Mr. Vraniak provided healthcare consulting services to private equity and healthcare companies as a principal of GSV Advisory Services, LLC. From February 2014 to January 2016, Mr. Vraniak served as Chief Financial Officer at G&W Laboratories, Inc., a specialty pharmaceutical company, where he executed the growth strategy by acquiring two companies and over 35 products. Prior to that, from October 2011 through July 2013, he was President of Aprecia Pharmaceuticals, Inc., a 3D printing technology enabled pharmaceutical company. From 2003 through 2011, Mr. Vraniak was the CFO and Head of Strategic Planning for Prasco Laboratories, a generic pharmaceutical company. From January 2000 to January 2002, he served

10

as Executive VP for GE Capital, and subsequently founded Preceptus, a boutique consulting firm focused on helping small and mid-market companies achieve efficient and scalable growth in the healthcare and technology sectors. Mr. Vraniak received an Electronic Engineering Technology degree and a Managerial MBA in Finance from the Rutgers University Center for Management Development.

**Defendant Posner**

39.     Defendant Posner has served as the Company's CFO since April 2019. According to the 2020 Proxy Statement, as of March 15, 2020, Defendant Posner beneficially owned 36,250 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2020 was $0.54, Defendant Posner owned $19,575 worth of electroCore stock.

40.     For the 2019 Fiscal Year, Defendant Posner received $1,129,013 in compensation from the Company. This included $263,541 in salary, $100,000 in bonus, $130,000 in stock awards, $618,476 in option awards, and $16,996 in all other compensation.

41.     The 2020 Proxy Statement stated the following about Defendant Posner:

Brian Posner, 58, has served as the Company's Chief Financial Officer since April 2019. He joined the Company from Cellectar Biosciences, where he most recently served as chief financial officer from April 2018 to March 2019. Prior to Cellectar, Mr. Posner was chief financial officer at Alliqua BioMedical from 2013 to 2018, chief financial officer at Ocean Power Technologies from 2010 to 2013 and chief financial officer at Power Medical Interventions in 2009. Before such time, Mr. Posner spent nine years at Pharmacopeia from 1999 to 2008, where he served as director of finance before serving as chief financial officer from 2006 to 2008 upon Pharmacopeia's acquisition by Ligand Pharmaceuticals. Before his employment with Pharmacopeia, Mr. Posner was chief financial officer and vice president of operations at Photosynthetic Harvest, a start-up biotechnology company, and regional chief financial officer at Omnicare. Mr. Posner began his career as an audit supervisor at Coopers & Lybrand, which merged with Price Waterhouse to become PricewaterhouseCoopers. Mr. Posner earned an MBA in Managerial Accounting from Pace University's Lubin School of Business and a BA in Accounting from Queens College.

**Defendant J. Errico**

42.     Defendant J. Errico is a co-founder of the Company and has served as a Company director since 2005. Previously, he served as the Company's Chief Science and Strategy Officer ("CSO") from July 2016 until June 2019, as the Company's CEO from January 2010 until July 2016, and as Chairman of the Board from March 2013 until June 2018. According to the 2020 Proxy Statement, as of March 15, 2020, Defendant J. Errico beneficially owned 4,170,876 shares of the Company's common stock, which represented 13.7% of the Company's outstanding stock on that date. Given that the price per share of the Company's common stock at the close of trading on March 13, 2020 was $0.54, Defendant J. Errico owned approximately $2.3 million of electroCore stock.

43.     For the 2019 Fiscal Year, Defendant J. Errico received $1,467,123 in compensation from the Company. This included $753,916 in salary, $172,744 in stock awards, $518,095 in option awards, and $22,368 in all other compensation. For the 2018 Fiscal Year, Defendant J. Errico received $1,127,187 in compensation from the Company. This included $389,792 in salary, $125,000 in stock awards, $442,000 in option awards, $150,000 in non-equity incentive plan compensation, and $20,395 in all other compensation.

44.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant J. Errico made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| January 15, 2019 | 22,349 | $4.90 | $109,510.10 |
| January 16, 2019 | 19,810 | $4.89 | $96,870.90 |
| January 17, 2019 | 7,841 | $4.84 | $37,950.44 |
| April 1, 2019 | 10,408 | $6.97 | $72,543.76 |
| April 11, 2019 | 13,723 | $5.49 | $75,339.27 |
| April 12, 2019 | 25,869 | $5.53 | $143,055.57 |

45.     Thus, in total, before the fraud was exposed, he sold 100,000 Company shares on inside information, for which he received approximately $535,270. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

46.     The 2020 Proxy Statement stated the following about Defendant J. Errico:

Joseph P. Errico, 51, served as the Company's Chief Science and Strategy Officer from July 2016 to June 2019, and previously served as the Company's Chief Executive Officer from January 2010 to July 2016. Mr. Errico has also served as a member of the Board since 2005, when he co-founded the Company with Thomas J. Errico, M.D., and Dr. Peter S. Staats, M.D., and as chairman of the Board from March 2013 until June 2018. Prior to founding the Company, Mr. Errico served as the General Manager of the Motion Preservation Unit of Stryker Spine, a Division of Stryker Corporation, from August 2004 through December 2007. Prior to that, Mr. Errico co-founded and served as the Chief Executive Officer and director for Spinecore, Inc., from September 2001 through August 2004, when that company was sold to Stryker Corporation. Mr. Errico received his B.S. in Aeronautical Engineering from the Massachusetts Institute of Technology, his M.S. in Mechanical Engineering and Materials Science from Duke University School of Engineering and his J.D. from Duke University School of Law. Mr. Errico also serves as the Managing Member of Core Ventures II, LLC and certain affiliated entities with an equity interest in the Company. The Board believes that Mr. Errico's extensive senior management experience in innovative healthcare technology companies, and his extensive knowledge and contributions to the Company's intellectual property, products, business, and the science of VNS, qualifies him to serve on the Board.

**Defendant Atieh**

47.     Defendant Atieh has served as a Company director since the IPO in June 2018. He also serves as the Chair of the Audit Committee. According to the 2020 Proxy Statement, as of March 15, 2020, Defendant Atieh beneficially owned 122,599 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2020 was $0.54, Defendant Atieh owned over $66,203 worth of electroCore stock.

48.     For the 2019 Fiscal Year, Defendant Atieh received $123,333 in compensation from the Company. This included $23,333 in fees earned or paid in cash and $100,000 in option

awards. For the 2018 Fiscal Year, Defendant Atieh received $229,534 in compensation from the

Company. This included $29,534 in fees earned or paid in cash and $200,000 in stock awards.

49.    The 2020 Proxy Statement stated the following about Defendant Atieh:

Michael G. Atieh, 66, has served as a member of the Board since the Company's
IPO in June 2018, and has served as the Chairman of the Board since April 1, 2020.
Since 1992, Mr. Atieh has served on the board of directors of Chubb Limited, a
publicly traded global insurance company, where he is a member of the risk and
finance committee and previously chaired the audit committee from 2012 to 2018.
From September 2014 until his retirement in March 2016, Mr. Atieh was Executive
Vice President, Chief Financial and Business Officer of Ophthotech Inc., a public
biotechnology company. From February 2009 until its acquisition in February
2012, Mr. Atieh was Executive Chairman of Eyetech Inc., a private specialty
pharmaceutical company. He was Executive Vice President and Chief Financial
Officer of OSI Pharmaceuticals, a public biotechnology company, from 2005 until
December 2008. He also served as a member of the board of directors of
Theravance Biopharma, Inc. from June 2014 to April 2015, and as a member of the
board of directors and chairman of the audit committee for OSI Pharmaceuticals
from June 2003 to May 2005. Previously, Mr. Atieh served at Dendrite
International, Inc. as Group President from January 2002 to February 2004 and as
Senior Vice President and Chief Financial Officer from October 2000 to December
2001. He also served as Vice President of U.S. Human Health, a division of
Merck & Co., Inc., from January 1999 to September 2000, as Senior Vice
President—Merck-Medco Managed Care, L.L.C., an indirect wholly-owned
subsidiary of Merck, from April 1994 to December 1998, as Vice President—
Public Affairs of Merck from January 1994 to April 1994 and as Treasurer of Merck
from April 1990 to December 1993. Mr. Atieh received his B.A. in Accounting and
Economics from Upsala College in 1975. Mr. Atieh is qualified to serve on the
Board because of his demonstrated leadership in the biomedical field, including
deep knowledge of sales and operations gained from over a decade of experience
in these disciplines, as well as his knowledge of financial and financing matters, his
current and prior board experience, and his ability to serve as a financial expert on
the Company's audit committee.

**Defendant Colucci**

50.    Defendant Colucci served as a Company director from August 2017 until June

2020. He also serves as the Chair of the Compensation Committee and as a member of the

Nominating and Governance Committee. According to the 2020 Proxy Statement, as of March 15,

2020, Defendant Colucci beneficially owned 93,799 shares of the Company's common stock.

Given that the price per share of the Company's common stock at the close of trading on March 13, 2020 was $0.54, Defendant Colucci owned over $50,651 worth of electroCore stock.

51.     For the 2019 Fiscal Year, Defendant Colucci received $121,458 in compensation from the Company. This included $21,458 in fees earned or paid in cash and $100,000 in stock awards. For the 2018 Fiscal Year, Defendant Colucci received $228,348 in compensation from the Company. This included $28,348 in fees earned or paid in cash and $200,000 in stock awards.

52.     The 2020 Proxy Statement stated the following about Defendant Colucci:

> Nicholas Colucci, 61, has served as a member of the Board since August 2017. Since February 2017, Mr. Colucci has been Chief Operating Officer of Publicis Groupe North America, a global communications company. From May 2007 to January 2017, Mr. Colucci served as Chief Executive Officer and Chairman of Publicis Health, the Groupe's health communications division and prior thereto, held a variety of account, strategy and leadership roles at Publicis Health, beginning in 1997. Prior to that, Mr. Colucci served as Vice President of Marketing & Sales at EyeSys Technologies (from 1995 to 1997) and as Marketing Director at Hoffman-La Roche (from 1982 to 1995). Since 2018, Mr. Colucci has served as a director of Southern Miami Pharmacy, a specialty pharmacy and provider of fertility, specialty and compounding services. Mr. Colucci has also previously served on the boards of directors of SDI/Verispan, a healthcare market research company, and of National Rehab, a wound care distribution company. Mr. Colucci received his B.S. in Neuroscience from the University of Rochester and his M.B.A. from Loyola University Maryland. Mr. Colucci will be retiring from the board effective immediately prior to the 2020 Annual Meeting.

**Defendant Cox**

53.     Defendant Cox served as a Company director and as the Chairman of the Board from the IPO in June 2018 until April 1, 2020. She also served as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee.

54.     For the 2019 Fiscal Year, Defendant Cox received $180,208 in compensation from the Company. This included $30,208 in fees earned or paid in cash and $150,000 in stock awards. For the 2018 Fiscal Year, Defendant Cox received $235,863 in compensation from the Company. This included $35,863 in fees earned or paid in cash and $200,000 in stock awards.

55.     The 2019 Proxy Statement stated the following about Defendant Cox:

Carrie S. Cox, 61, has served as a member of our Board and the Chairman of the Board since our initial public offering in June 2018. Since 2010, Ms. Cox has served as a director and member of the audit committee of Humacyte, Inc., a regenerative medical technology company. From 2010 to 2019, Ms. Cox served as Chief Executive Officer and Chairman of the Board of Humacyte, Inc. Prior to joining Humacyte, Inc., Ms. Cox served as Chairman of Prism Pharmaceuticals, which was sold to Baxter Corporation in 2011. Ms. Cox was EVP and President, Global Pharmaceuticals, at Schering-Plough Corporation, from 2003 until its merger with Merck & Co., Inc., in November 2009. Prior to joining Schering-Plough, Ms. Cox served as President of Pharmacia Corporation's pharmaceutical business until its merger with Pfizer Inc. in 2003. Previously, Ms. Cox served as SVP of Global Business Management at Pharmacia & Upjohn (the predecessor to Pharmacia), and as VP of Women's Healthcare at Wyeth-Ayerst. She spent her early career at Sandoz pharmaceuticals (now Novartis) in a variety of commercial roles of increasing responsibility. Ms. Cox currently serves on the Boards of Directors of Texas Instruments, Cardinal Health, and Celgene, and she has served as Lead Director for Texas Instruments. She received her B.S. from Massachusetts College of Pharmacy. Ms. Cox is qualified to serve on our Board by virtue of her distinguished career in global healthcare and her significant experience and leadership serving in executive positions of some of the largest and most successful multi-national healthcare companies in the world, including with responsibility for those companies' financial performance and significant capital and research and development investments.

**Defendant T. Errico**

56.     Defendant T. Errico co-founded the Company and has served as a Company director since September 2005. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Governance Committee. According to the 2020 Proxy Statement, as of March 15, 2020, Defendant T. Errico beneficially owned 3,538,012 shares of the Company's common stock, which represented 11.8% of the Company's outstanding stock on that date. Given that the price per share of the Company's common stock at the close of trading on March 13, 2020 was $0.54, Defendant T. Errico owned over $1.9 million worth of electroCore stock.

57.     For the 2019 Fiscal Year, Defendant T. Errico received $120,938 in compensation from the Company. This included $20,938 in fees earned or paid in cash and $100,000 in option

awards. For the 2018 Fiscal Year, Defendant T. Errico received $227,688 in compensation from the Company. This included $27,688 in fees earned or paid in cash and $200,000 in stock awards.

58.    The 2020 Proxy Statement stated the following about Defendant T. Errico:

Thomas J. Errico, M.D., 68, has served as a member of the Board since September 2005, when he co-founded the company with Joseph P. Errico and Peter S. Staats, M.D. Dr. Errico has been a board-certified orthopedic surgeon since 1986, and currently serves as a pediatric orthopedic spine surgeon at Nicklaus Children's Hospital. He served as the Chief, Division of Spine Surgery in Orthopedics, NYU Langone Health from 1997 until 2019. He is also currently Adjunct Professor, Department of Orthopaedic Surgery in the NYU Grossman School of Medicine. In addition, Dr. Errico is a member of the International Society for the Advancement of Spine Surgery, and served as its President from 2010 to 2011. He is also an original member of the North American Spine Society, and served as its President from 2003 to 2004. Dr. Errico has founded multiple companies in the healthcare industry, including Spinecore, Inc. in 2002, where he served as a director until it was sold to Stryker, Inc. in 2004. Dr. Errico was also a founding member of K2M Group Holdings, Inc. in January 2004. Dr. Errico holds a B.S. in Zoology from Rutgers University and an M.D. from Rutgers Medical School, formerly the University of Medicine and Dentistry of New Jersey. The Board believes Dr. Errico is qualified to serve on the Board due to his long tenure as a practicing spine-surgeon and his leadership role with a world-class medical institution, as well as serving as a co-founder, director and investor in a number of successful early stage healthcare companies.

**Defendant Moody**

59.    Defendant Moody has served as a Company director since March 2013. He also serves as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of March 15, 2020, Defendant Moody beneficially owned 90,351 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2020 was $0.54, Defendant Moody owned approximately $48,790 worth of electroCore stock.

60.    For the 2019 Fiscal Year, Defendant Moody received $118,750 in compensation from the Company. This included $18,750 in fees earned or paid in cash and $100,000 in stock

awards. For the 2018 Fiscal Year, Defendant Moody received $223,733 in compensation from the Company. This included $23,733 in fees earned or paid in cash and $200,000 in stock awards.

61.     The 2020 Proxy Statement stated the following about Defendant Moody:

Trevor J. Moody, 55, has served as a member of the Board since March 2013. Mr. Moody has served since January 2010 as President of TM Strategic Advisors LLC, a management consultancy serving the boards, investors, and senior management of both emerging and established medical technology companies. He also currently serves as Medical Device Partner at MH Carnegie & Co. Pty Ltd (since October 2013), where he makes venture capital investments in medical device companies. From July 2015 to December 2015, Mr. Moody served as interim CEO of a MH Carnegie & Co. portfolio company, Cardiac Dimensions Pty Ltd. From 1999 to 2010, Mr. Moody was at Frazier Healthcare Ventures, a large healthcare-focused venture capital and private equity investment firm. He was a General Partner at Frazier Healthcare Ventures from 2005 to 2010. Prior to that, he was a Senior Consultant at The Wilkerson Group, a leading healthcare strategic consultancy. Mr. Moody currently also serves on the board of directors of a non-profit called Angel Flight West, and on the boards of several private corporations, including EBR Systems, Inc., Renew Medical Pty Ltd, Serene Medical Pty Ltd, Brain Protection Company Pty Ltd, CurvaFix, Inc., and Simplify Medical Pty Ltd. Mr. Moody received his Bachelor of Engineering from the University of Southern Queensland, Australia, and his M.S. in Management from the Massachusetts Institute of Technology (Sloan School). The Board believes that Mr. Moody's experience, with over 25 years in the development, commercialization and funding of innovative, growth-oriented medical technologies, qualify him to serve on the Board.

**Defendant Ondra**

62.     Defendant Ondra has served as a Company director since the IPO in June 2018. He also serves as a member of the Nominating and Governance Committee. According to the 2020 Proxy Statement, as of March 15, 2020, Defendant Ondra beneficially owned 65,633 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2020 was $0.54, Defendant Ondra owned approximately $35,442 worth of electroCore stock.

63.     For the 2019 Fiscal Year, Defendant Ondra received $118,229 in compensation from the Company. This included $18,229 in fees earned or paid in cash and $100,000 in option

awards. For the 2018 Fiscal Year, Defendant Ondra received $223,074 in compensation from the

Company. This included $23,074 in fees earned or paid in cash and $200,000 in option awards.

64.     The 2020 Proxy Statement stated the following about Defendant Ondra:

Stephen L. Ondra, M.D., 63, has served as a member of the Board since the
Company's IPO in June 2018. Dr. Ondra is Chief Executive Officer of North Star
Healthcare Consulting, a healthcare technology consulting company that he
founded in 2017. From 2013 to 2016, Dr. Ondra served as Senior Vice President
and Chief Medical Officer of Health Care Service Corporation, the largest
customer-owned health insurance company in the United States, which operates as
Blue Cross and Blue Shield in Illinois, Montana, New Mexico, Oklahoma and
Texas. Prior to his move to the payer sector, from 2012 to 2013, Dr. Ondra served
as Senior Vice President and Chief Medical Officer of Northwestern Memorial
Hospital. Dr. Ondra left Northwestern in 2009 when he was appointed by President
Obama as the Senior Policy Advisor for Health Affairs of the U.S. Department of
Veterans Affairs. He was detailed to the Executive Office of the President of the
United States from 2010 to 2012. At the White House, he served in several
positions, including Co-Chair of the National Science and Technology Council for
Health Information Technology, as a member of the Federal Health Information
Technology Policy and Standards Committees, and as a member of the
Implementation Deputy Group for the Affordable Care Act. In 2015, Dr. Ondra was
appointed to be a member of the Guiding Committee of the Department of Health
and Human Services Health Care Payment – Learning and Action Network. He also
has served as an adjunct senior fellow at the Center for a New American Society
from 2015 to 2018. A Board Certified Neurosurgeon, Dr. Ondra was a Professor of
Neurosurgery and Residency Program Director at Northwestern University's
Feinberg School of Medicine from 1996 to 2009. He has also served as the interim
chair of Neurological Surgery at Northwestern. Dr. Ondra is a Trustee of Illinois
Wesleyan University and has served on the board of TriWest Healthcare Alliance,
the Louis W. Sullivan Institute for Healthcare Transformation, and was Chair of
the scientific advisory boards of the Defense Spinal Cord/Column Injury and the
Spine Blast Injury of the Department of Defense. Dr. Ondra attended the U.S.
Military Academy and completed pre-medical studies at Illinois Wesleyan
University, obtaining his B.A. He then received his M.D. from Rush Medical
College in Chicago and subsequently completed residency training in Neurosurgery
at the Walter Reed Army Medical Center in Washington D.C. As an U.S. Army
physician, Dr. Ondra served with distinction in Operations Desert Shield and
Desert Storm and was awarded Bronze Star and Army Commendation Medals. The
Company believes Dr. Ondra is qualified to serve on the Board due to his expertise
and achievements in medicine, medical policy, health information technology and
innovation, as well as his keen understanding of healthcare policy and complex
healthcare delivery systems, which has made him a source of counsel for numerous
CEOs, health care executives and policymakers in the United States and
internationally.

**Defendant Ross**

65.     Defendant Ross served as a Company director from March 2018 until the IPO in June 2018.

66.     The Registration Statement stated the following about Defendant Ross:

*Michael W. Ross* has served on our board of directors since March 2018. Since October 2016, Mr. Ross has served on the board of directors of Fresco Foods Inc., a company in the food and beverage industry. Mr. Ross has worked for the Vinik Family Office since September 2017, directing the financial and operating strategies of private equity portfolio companies. Prior to his role with the Vinik Family Office, from January 2004 to August 2017, Mr. Ross independently provided strategic and financial consulting and executive management to various small to mid-size companies. During his employment with Publix Super Markets, Inc. from 2000 to 2005, he held the position of manager of business analysis, providing analytical support to corporate strategy initiatives. From March 2013 to May 2016, he served as a strategy consultant and CFO to JJ Virgin & Associates, a nutrition, health and wellness company. From January 2014 to June 2014, Mr. Ross acted as CEO of Thunderbolt International, Inc., a company engaged in the design, manufacture, and sale of specialized electronics. Mr. Ross obtained a B.S. in mechanical engineering from Case Western Reserve University and his MBA in finance, MIS, and Marketing Strategy from the University of South Florida. Our board of directors believes that Mr. Ross' background and experience as a CEO and CFO of various companies qualifies him to serve on our board of directors. Mr. Ross will resign from our board at or prior to the effectiveness of the registration statement to which this prospectus is a part.

**Defendant Rubin**

67.     Defendant Rubin served as a Company director from March 2013 until the IPO in June 2018.

68.     The Registration Statement stated the following about Defendant Rubin:

*David M. Rubin, Ph.D.* has served as a member of our board of directors since March 2013. Dr. Rubin is currently a managing director at GHI, where he is responsible for identifying investment opportunities in emerging health care solutions and services, with a particular emphasis on oncology and infectious disease digital health. Prior to joining GHI, Dr. Rubin was portfolio director for Merck & Co.'s MRL Oncology franchise. Dr. Rubin joined Merck in 2007 from Cognia Corporation, a venture-backed research and development software and content products company, where he was the president and chief executive officer. Previously, Dr. Rubin was at The Wilkerson Group/IBM Global Services.

Dr. Rubin previously served on the board of VirtualScopics, Inc. (Nasdaq: VSCP) from 2012 through 2014. Dr. Rubin currently serves on the boards of directors of OpGen, Inc., (Nasdaq: OPGN) and Navigating Cancer, Inc. Dr. Rubin was a National Institute of Health and American Cancer Society post-doctoral fellow at Harvard Medical School. Dr. Rubin also received training in post graduate business at Harvard University. Dr. Rubin holds a Ph.D. from Temple University in Molecular Biology and a B.A. from SUNY Binghamton in Biology. Dr. Rubin's extensive background working with precision medicine and diagnostic companies, his investing experience, his current executive position with Merck GHI and scientific background qualify Dr. Rubin to serve on to our board of directors. Dr. Rubin will resign from our board at or prior to the effectiveness of the registration statement to which this prospectus is a part.

### **Defendant Tullis**

69.     Defendant Tullis has served as a Company director since July 2014. He also serves as a member of the Audit Committee. According to the 2020 Proxy Statement, as of March 15, 2020, Defendant Tullis beneficially owned 366,642 shares of the Company's common stock, which represented 1.2% of the Company's outstanding stock on that date. Given that the price per share of the Company's common stock at the close of trading on March 13, 2020 was $0.54, Defendant Tullis owned approximately $197,987 worth of electroCore stock.

70.     For the 2019 Fiscal Year, Defendant Tullis received $120,000 in compensation from the Company. This included $20,000 in fees earned or paid in cash and $100,000 in stock awards. For the 2018 Fiscal Year, Defendant Tullis received $225,315 in compensation from the Company. This included $25,315 in fees earned or paid in cash and $200,000 in stock awards.

71.     The 2020 Proxy Statement stated the following about Defendant Tullis:

James L.L. Tullis, 73, has served as a member of the Board since July 2014. Mr. Tullis founded Tullis Health Investors (a/k/a Tullis Dickerson & Co., Inc.), a venture capital firm specializing in investments in the healthcare industry, in 1986, and served as its Chief Executive Officer until January 2019. Prior to that, Mr. Tullis was a Senior Vice President at E.F. Hutton & Co., a stock brokerage firm, and a principal at Morgan Stanley & Co., where he worked with the healthcare investment research and banking teams. Mr. Tullis has served as a member of the board of directors (since 2006) and as chairman of the board of directors (since 2017) of Lord Abbett Mutual Funds. He has also served as Chairman (since April

2020) and as a member (since 1998) and chair of the compensation committee of the board of directors of Crane Co., a manufacturer of highly engineered industrial products. Since March 2018, Mr. Tullis has been a member of the board of directors of ATEC Spine, a provider of spine surgery solutions.

Mr. Tullis also currently serves as a member of the board of directors of Exagen Diagnostics, Inc. (XGN), a diagnostics company focused on autoimmune rheumatic diseases. Mr. Tullis holds a B.A. from Stanford University and an M.B.A. from Harvard Business School. Mr. Tullis will be retiring from the board upon completion of his term as a Class II director, effective immediately prior to the 2020 Annual Meeting.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

72.     By reason of their positions as officers and/or directors of electroCore and because of their ability to control the business and corporate affairs of electroCore, the Individual Defendants owed electroCore and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage electroCore in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of electroCore and its shareholders so as to benefit all shareholders equally.

73.     Each director and officer of the Company owes to electroCore and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

74.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of electroCore, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

75.     To discharge their duties, the officers, directors, and controllers of electroCore were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

76.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of electroCore, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised electroCore's Board at all relevant times.

77.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

78.     To discharge their duties, the officers and directors of electroCore were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of electroCore were required to, among other things:

(a)      ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New Jersey, Delaware, and the United States, and pursuant to electroCore's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how electroCore conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of electroCore and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that electroCore's operations would comply with all applicable laws and electroCore's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

79.      Each of the Individual Defendants further owed to electroCore and the shareholders the duty of loyalty requiring that each favor electroCore's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

80.      At all times relevant hereto, the Individual Defendants were the agents of each other and of electroCore and were at all times acting within the course and scope of such agency.

81.      Because of their advisory, executive, managerial, directorial, and controlling positions with electroCore, each of the Individual Defendants had access to adverse, non-public information about the Company.

82.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by electroCore.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

83.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

84. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, and future business prospects; and (iii) artificially inflate the Company's stock price.

85. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of electroCore was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

86. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

87.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of electroCore, and was at all times acting within the course and scope of such agency.

## ELECTROCORE'S CODE OF CONDUCT AND GOVERNANCE

*electroCore's Code of Conduct*

88.     The Company's Code of Conduct provides that it "should be considered to be a minimum standard" and that it "applies everywhere we do business and to all of our directors, officers, employees and third party representatives."

89.     The Code of Conduct also provides that "[a]ll Company Personnel have a duty to report any known or suspected violation of this Code, including any violation of laws, rules, regulations or policies that apply to the Company." The Code of Conduct further states that the Company "expects all Company Personnel to comply with this Code, as well as with all laws, regulations, rules, and established guidelines governing our business," that "Company Personnel who violate this Code or other Company policies and procedures will be subject to appropriate discipline," and that "Company Personnel who fail to report known or suspected violations by other Company Personnel may also be subject to appropriate discipline."

90.     In a section titled, "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> A conflict of interest occurs when any Company Personnel's private interest interferes, or appears to interfere, in any way with the Company's interests as a whole. You should avoid any private interest that may influence your ability to act in the Company's interests or that makes it difficult to perform your work objectively and effectively.
>
> * * *
>
> The Company requires that Company Personnel fully disclose any situations that reasonably could be expected to give rise to a conflict of interest. If you suspect

that you have a conflict of interest, or something that others could reasonably perceive as a conflict of interest, you must report it immediately.

91.     In a section titled, "Insider Trading," the Code of Conduct states the following:

Company personnel who have material non-public information about the Company or other companies, including our suppliers and customers, as a result of their relationship with the Company are prohibited by law and Company policy from trading in securities of the Company or such other companies, as well as from communicating such information to others who might trade on the basis of that information.

Securities laws and violations are taken very seriously. Please refer to electroCore's Insider Trading Policy for more information. If you are uncertain about the constraints on your purchase or sale of any Company securities or the securities of any other company that you are familiar with by virtue of your relationship with the Company, you should consult with the Compliance Officer, or with such other person as designated by electroCore's Insider Trading Policy, before making any such purchase or sale.

92.     In a section titled, "Corporate Communications," the Code of Conduct states the following:

The Company maintains a Corporate Communications Policy to ensure that communications to the public by or on behalf of the Company are (i) consistent, accurate and fair, (ii) disseminated on a timely basis and in a manner reasonably designed to provide broad non-exclusionary distribution of information to the public and (iii) made in a manner that complies with the Securities and Exchange Commission's "Regulation Fair Disclosure" and other applicable laws. Please refer to the electroCore Corporate Communications Policy for more information.

93.     In a section titled, "Company Personnel Obligations," the Code of Conduct states, in relevant part, that "[a]ll Company Personnel must:"

• Provide information that is accurate, complete, objective, relevant, timely, and understandable.
• Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing one's independent judgment to be subordinated.
• Share knowledge and maintain skills important and relevant to constituents' needs.
• Respect the confidentiality of information acquired in the course of one's work, except when authorized or otherwise legally obligated to disclose. Confidential information acquired in the course of one's work will not be used for personal advantage.

94.      In a section titled, "Confidential Information," the Code of Conduct states, in pertinent part, that:

> Company Personnel have access to a variety of confidential information while employed at or involved with the Company. Company Personnel should not use information obtained as a result of their employment at or involvement with the Company for personal gain. Confidential information includes all non-public information that might be of use to investors in making a decision to buy, hold or sell the Company's securities, or to competitors, or harmful to the Company or its customers, if disclosed. Company Personnel have a duty to safeguard all confidential information, except when disclosure is authorized or legally mandated.

95.      In a section titled, "Protection and Use of Company Assets," the Code of Conduct states, in relevant part, that "[a]ll Company Personnel should protect the Company's assets and ensure their efficient use for legitimate business purposes only."

96.      In a section titled, "Company Records," the Code of Conduct states that "[a]ll the Company records must be complete, accurate and reliable in all material respects."

97.      In a section titled, "Financial Reporting & Payment Practices," the Code of Conduct states the following:

> The Company's mission includes significant efforts to promote ethical conduct in the practice of financial management throughout our Company.
>
> Company Personnel should be on guard for, and promptly report, evidence of improper financial reporting. Examples of suspicious activities that should be reported include:
>
> • Financial results that seem inconsistent with the performance of underlying business transactions;
> • Inaccurate Company records, such as overstated expense reports, or erroneous time sheets or invoices;
> • Transactions that do not seem to have a good business purpose; and,
> • Requests to circumvent ordinary review and approval procedures.
>
> The Company's financial and accounting staff has responsibility to ensure that all of the financial reports are full, fair, accurate, timely and understandable. It is the policy of the Company to provide full, fair, accurate, timely, and understandable disclosure in reports and documents filed with, or submitted to, the Securities and Exchange Commission and in other public communications.

Company Personnel shall adhere to the legal requirements of each country in which the Company conducts business and shall employ the highest ethical standards. No undisclosed or unrecorded company fund or asset shall be established for any purpose, and no false or misleading entries shall be made in the company's books or records. No payment on the Company's behalf shall be without adequate support documentation or made for any purpose other than as described in the documents. Company Personnel shall comply with generally accepted accounting principles and company internal control procedures at all times.

Company Personnel should refer to the electroCore Whistleblower and Complaint Policy for more information concerning complaints regarding accounting, internal controls or auditing matters.

98.     In a section titled, "Compliance with Laws and Regulations," the Code of Conduct states the following:

Company Personnel have an obligation to comply with the laws of the cities, states and countries in which the Company operates. We will not tolerate any activity that violates any laws, rules or regulations applicable to the Company. This includes, without limitation, laws covering commercial bribery, kickbacks and inducements to Health Care Professionals (HCPs), health care fraud and abuse laws, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your position. Company Personnel have an obligation to cooperate with the Company and to respond to any request from the Company for information which may be relevant to obligations of the Company to comply with disclosure requirements pursuant to applicable laws, rules and regulations.

***electroCore's Corporate Governance Guidelines***

99.     The Corporate Governance Guidelines provide the following:

The members of the Board are elected by the stockholders of the Company to oversee, and provide strategic guidance to, senior management of the Company. As a director, each Board member stands in a fiduciary relationship to the Company and its stockholders. As such, each director is required to perform his or her duties in good faith, in a manner he or she reasonably believes to be in the best interests of the Company and its stockholders and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." and reminds each Board member of his/her obligation to comply with the Company's general Code of Conduct.

100.    The Corporate Governance Guidelines further provide that "[t]he Board is committed to legal and ethical conduct in fulfilling its responsibilities" and that "[t]he Board expects all directors, as well as officers and employees of the Company, to adhere to the Company's Code of Business Conduct and Ethics."

101.    In violation of the Code of Conduct and the Company's other governance policies, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act, and aiding and abetting thereof. Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

102.    electroCore is a commercial stage medical device company with a proprietary non-invasive vagus nerve stimulation, prescription-only therapy, gammaCore. gammaCore purportedly modulates neurotransmitters and immune function through its effects on both the peripheral and central nervous systems and is intended to acutely treat and prevent, *inter alia*, migraine and cluster headache pain in adults.

103.    The Company was initially founded in 2005 as electroCore, LLC by Defendant J. Errico, his uncle, T. Errico, and non-parties Charles Theofilos ("Theofilos") and Peter S. Staats ("Staats"). electroCore opened as a small company and has remained that way, with only 64

employees at the time of its IPO. After a short-term growth of 91 full-time employees as of March 1, 2019, the Company shrunk again, employing only 51 people as of March 1, 2020.

104.    The Company's lead therapy product, gammaCore, is a "prescription-only vagus nerve stimulation, or VNS, therapy administered in discrete doses using a proprietary, simple-to-use handheld delivery system." gammaCore stimulates the vagus nerve, which carries signals from the digestive system to the brain, with electrical currents using "high-frequency burst waveform" which supposedly "has a measurable pharmacologic effect similar to several classes of medications." gammaCore, as the Company claims, has expanded VNS beyond "the most refractory patients, who were willing to endure surgery." The distribution of the vagus nerve to multiple organs, as shown in the Registration Statement, is pictured below:



105.    Initially, the Company's gammaCore delivery platform was a disposable device that dispensed therapy on a "31-day prescription basis." However, the Company's next version of the product, gammaCore Sapphire, is "rechargeable and reloadable," and thus "intended for multi-year use" and "activated on a monthly basis through the input of a unique, prescription-only authorization code" which is "delivered via a radio-frequency identification [] card."

106.    At the time of the Company's IPO, the launch of the Company's "next generation product," gammaCore Sapphire, was anticipated to take place during the third quarter of 2018.

Then, electroCore would phase out the Company's original gammaCore product. The gammaCore Sapphire is pictured below:



107.    The FDA granted the Company's *de novo* application ("a regulatory pathway for products deemed to be low to moderate risk, but without an applicable predicate") in April 2017, giving electroCore regulatory clearance for the commercial sale of gammaCore for use as an acute treatment of pain associated with episodic cluster headaches in adults. Later that year, in December 2017, the FDA granted gammaCore Sapphire regulatory clearance via the Company's 510(k) submission.

108.    According to electroCore, cluster headaches are "short but extremely painful headaches" described by patients and physicians as "one of the most painful conditions in medicine." The condition mostly afflicts 20- to 50-year-old males. An "attack" can typically last between fifteen minutes and three hours and they often cluster for two to twelve-week periods, which is generally followed by a remission period. Dubbed the "suicide headache," cluster headache sufferers commit suicide at a rate that is twenty times higher than the U.S. national average. According to the Company, approximately 350,000 people in the U.S. suffer from cluster headaches, with only 225,000 people seeking treatment each year. Thus, the Company estimated the 2018 market for treatment to be about $400 million. According to the Company, at the time of

the IPO, there was only one other FDA-approved cluster headache treatment, injectable sumatriptan, which could be costly and toxic.

### *The Competitive Landscape Surrounding the Company*

109.    Because the market for acute cluster headache patients was so small, it was critical for the Company to have the capacity to expand into additional markets. Toward that end, the Company applied for and the FDA granted, in January 2018, regulatory clearance for gammaCore's use for the acute treatment of pain associated with migraine in adults. electroCore estimated that, at the time of the IPO, there were about 36 million people in the U.S. that suffered from migraines. The Company approximated that the market for acute treatment of migraines in 2018 was $3.8 billion.

110.    Moreover, during the Company's IPO, electroCore had been attempting to expand its label for gammaCore's treatment including for migraine prevention, migraines in adolescent, and post-traumatic headache. A chart of the Company's "Headache Pipeline" is below:



| Indication | Preclinical / Pilot Trials | Pivotal Trials | FDA Clearance | Commercial Launch[1] | Key Milestones |
|---|---|---|---|---|---|
| Acute Treatment of Episodic Cluster Headache | | | | | • FDA clearance April '17<br>• Commercial registry initiated 3Q '17<br>• Full commercial launch expected 3Q '18 |
| Acute Treatment of Migraine | | | | | • FDA label expansion January '18<br>• Full commercial launch expected 3Q '18 |
| Migraine Prevention | | | | | • Final PREMIUM trial data expected 2Q '18<br>• 2nd pivotal trial initiation expected 2H '18 |
| Migraine in Adolescents | | | | | • Pivotal trial initiation expected 2H '18 |
| Post-Traumatic Headache | | | | | • Initial preclinical studies in progress<br>• Pilot trial initiation expected 2H '18 |

111.    While the Company was in the process of obtaining regulatory clearance from the FDA, however, multiple competitors had also secured regulatory clearance from the FDA for similar uses and/or entered the market. One of those competitors was granted marketing approval for their product as early as December 18, 2013. Specifically, the first FDA approved device to

relieve pain caused by migraine headaches that are preceded by an aura was eNeura, Inc.'s ("eNeura") Cerena Transcranial Magnetic Stimulator. Moreover, the FDA granted 510(k) clearance of the following version of eNeura's product, the SpringTMS, on May 23, 2014. According to eNeura, "SpringTMS is a prescription-only device that utilizes single-pulse Transcranial Magnetic Stimulation [] to induce very mild electrical currents that can depolarize neurons in the brain." SpringTMS was the "first medical device available to patients in the United States for the acute treatment of pain associated with migraine headache with an aura."

112.    On September 7, 2017, the FDA granted eNeura's 510(k) application for clearance for SpringTMS as a preventative treatment for migraines, making it the only device with FDA approval for both acute and preventative treatment of migraine headache.

113.    Also, on March 12, 2014, the FDA made the Cefaly Acute Medical Device the first transcutaneous (i.e., passes through the skin) electrical nerve stimulation (TENS) device to obtain marketing approval for use as a preventive treatment in the U.S. for migraines. The FDA granted a new Cefaly medical device clearance for treatment of an acute migraine, with or without aura, on September 21, 2017. The Cefaly Acute enables migraine sufferers to not only use the device as a preventative measure but also during a migraine attack as well.

114.    Another competitive product, the Scion NeuroStim TNM, is a prescription device used to stimulate the vestibular system by applying thermal waveforms through earpieces placed in a patient's ear canal for the treatment of migraine headache. At the time of electroCore's IPO, this device was also nearing regulatory clearance as its application was sent to the FDA on April 17, 2017. Almost a year later, on March 26, 2018, it achieved FDA approval.

115.    Prior to the IPO, on top of the above listed competitor-devices, a new type of drug called calcitonin gene-related peptide ("CGRP") inhibitors either secured or were nearing FDA regulatory clearance.

116.    For instance, on May 17, 2018, erenumab (Aimovig), became the first CGRP inhibitor to obtain FDA approval for use for the prevention of migraine in adults. On July 20, 2017, Amgen, Inc. (U.S.) ("Amgen") was granted FDA approval as well after it had submitted its Biologics License Application ("BLA") (a request for permission to introduce or deliver for introduction, a biologic product into interstate commerce) to the FDA on May 18, 2017. On January 22, 2018, Novartis International AG (rest of world) ("Novartis") reported that erenumab "met all primary and secondary endpoints in a unique phase IIIb study in episodic migraine patients who ha[d] failed multiple prior preventive treatments." To be competitive with additional CGRP inhibitors that would soon hit the market, Amgen and Novartis priced erenumab substantially beneath expectations. While some analysts expected the preliminary pricing of erenumab to be as great as $833 per month, erenumab was actually priced at only $575 per month. The low price, in conjunction with the "Aimovig Copay Program," the out-of-pocket cost of the drug could be only $5 per month per patient.

117.    On September 14, 2018, the FDA granted regulatory clearance to fremanezumab (Ajovy) for the prevention of migraine, after Teva Pharmaceuticals had submitted its BLA on October 17, 2017. Notably, the FDA had accepted the application for priority and fast track review on December 18, 2017.

118.    Likewise, on September 27, 2018, the FDA granted regulatory clearance to galcanezumab (Emgality), for the preventative treatment of migraine. Notably, the FDA received the BLA on December 11, 2017.

*electroCore's IPO*

119.    In February 2018, the Individual Defendants began implementing steps to take the Company public. On February 13, 2018, the Company filed a draft registration statement on Form DRS with the SEC. A few months later, on May 21, 2018, the Company filed the Registration Statement. On June 5, 2018, the Company filed an amendment to the Registration Statement on Form S-1/A with the SEC. The amendment stated that 4,983,332 shares of electroCore common stock would be registered in the IPO, at a proposed maximum offering price per share of $16. Two subsequent amendments were filed with the SEC the next day on June 6, 2018, and on June 15, 2018. The Registration Statement was declared effective the same day, on June 21, 2018.

120.    The Company's stock began trading publicly on the Nasdaq Global Market the next day, on June 22, 2018. On June 25, 2018, the Company filed the Prospectus with the SEC on Form 424B4. Through the IPO, over 5.2 million shares of stock were sold at $15 per share, including additional shares sold through options exercised by the underwriters to the IPO. The IPO closed on June 26, 2018, with the Company having sold 5,980,000 shares of Company stock to the public at $15 per share. On June 28, 2018, the Company sold an additional 780,000 shares of common stock at $15 per share, less underwriting discounts and commissions, pursuant to the option for underwriters to purchase additional shares in the IPO. As a result of the IPO, electroCore received aggregate net proceeds of over $83.4 million, net of underwriter discounts and commissions.

### Significant Undisclosed Issues Plague the Company's Operations

121.    During the Relevant Period, despite depicting an outward image of success and growth potential, the Company faced numerous challenges to its business and prospects. Among the largest challenges the Company faced was that its flagship product, gammaCore, lacked insurance coverage due to electroCore's failure to secure the necessary agreements with certain commercial payors. For physicians that met with Company employees, insurance coverage was

often determinative in electing to forego prescribing a patient gammaCore, since it would be prohibitively expensive for their patients without insurance coverage. Although some doctors took additional steps, including writing to the insurance companies on behalf of their patients, even then, gammaCore was only covered approximately 10% of the time.

122.    Moreover, studies of gammaCore failed to confirm that the treatment worked due to its high placebo rate, and were often described as too small. Internally, gammaCore was known as a product with limited use for a niche market. The treatment was mainly confined to patients who had excessive pain, but also had issues with addiction and thus needed to avoid drug-related treatments. Additionally, gammaCore was also having a problem standing out amongst its competition, since products with comparable efficacy were available in an already small market.

123.    Due to issues with gammaCore's durability, the Company's lead product was also ineligible to obtain certain code designations (which were only available once per year) that would help secure agreements with commercial payors. Moreover, even the few occasions when those commercial payors did want to cover the treatment, they often were unable to find gammaCore on the relevant database since it was not assigned a drug codes and therefore was not easily accessible.

124.    In addition, the Company's voucher program was not effective as it failed to artificially inflate the appearance of demand of gammaCore to encourage commercial payors to cover the treatment. Due to the Company's lack of success in creating demand for the product and, consequently, revenue, the Company was forced to eventually cut back on much needed sales representatives to reduce costs.

125.    Finally, as for the Company's attempt to move into the preventative treatment space, the FDA had expressed concerns to the Company regarding the robustness of data to support such a use.

126.   The Company's challenges were no secret within electroCore, and amongst, *inter alia*, commercial payors. Indeed, as expounded below, over a half-dozen former employee witnesses cited to in the Securities Class Action made statements corroborating the Company's undisclosed issues prior to and during the Relevant Period and offering insight into certain of the Individual Defendants' awareness of the problems.

Issues Relating to Commercial Payor and Insurance Coverage Resulting in Physician Hesitation to Prescribe gammaCore

127.   According to the Securities Class Action, a former Company employee, referred to in the Securities Class Action as "CW1," who worked as electroCore's Senior Director of Medical Affairs between June 2018 and November 2018, and then as electroCore's Vice President of Medical Affairs between November 2018 and June 2019 stated that, after speaking with dozens of doctors during 2018 and 2019, "[t]he biggest issue" CW1 "would hear after [] describing the science of the product is they would say 'I would like to prescribe this. I wish it was covered by the insurance companies.'" CW1 also noted that physicians expressed concerns regarding the cost of gammaCore to patients because it was often not covered by insurance. According to CW1, the Company had not been included on the formulary (the list of drugs and services covered by an insurance company) of any insurance company as of June 2019.

128.   CW1 also stated that doctors mentioned that gammaCore appeared to be similar to other devices, including Cefaly, which they had already been prescribing to patients and that gammaCore "seemed comparable [in efficacy] to other devices."

129.   A former Company employee, referred to in the Securities Class Action as "CW2," worked as electroCore's Medical Science Liaison between October 2017 and June 2019 and stated that, after traveling to give physicians, researchers, prescribers, insurance providers presentations about gammaCore and the clinical trials, that former provided weekly updates to the Vice President

of Medical Affairs about the meetings and presentations which highlighted new insights, questions, or concerns that had been raised. Additionally, CW2 stated that physicians had expressed that pricing was their main concern and that they considered gammaCore to be a good fit for patients in a great deal of pain who also desired to avoid pharmaceutical treatments due to a struggle with addiction. CW2 also noted that physicians expressed unease over gammaCore's 20% placebo rate. CW2 stated that, as of June 2019, electroCore did not have any insurance agreements.

130.   Another former Company employee, referred to in the Securities Class Action as "CW3," worked remotely (but spent time at the Company's New Jersey headquarters) as electroCore's Vice President of Payor and Provider Strategies between April 2015 and January 2019. CW3 stated that the Company's Vice President of Sales and Marketing, non-party Dan Duhart ("Duhart"), nor Defendant Amato, who Duhart reported to, were "experts in managed care" and that Duhart's "experience in pharma is really from the sales side, which is totally different than payor strategy and market access. It's a completely different world." Moreover, CW3 provided them with regular briefings on the Company's efforts to connect with commercial payors and that at the time of the IPO in June 2018, the Company was intensely focused on its efforts to lockdown contracts. CW3 stated, "[i]t's a prolonged process, which I'm not certain that everyone understood at the time. I don't believe they wanted to understand it. They were determined that they were going public and once they did go public, they expected things to fall into place that weren't aligned to be in place at the time."

131.   CW3 also stated that the Company was attempting to secure reimbursement for gammaCore as a pharmacy benefit rather than a medical benefit, many commercial payors were obligated to cover Durable Medical Equipment, like gammaCore, as a medical benefit. After

having discussions with commercial payors, this former employee explained that their main concern was gammaCore's trials, stating "[t]hey all mentioned the studies that were done, what was wrong with the studies. None of the studies had hit their primary endpoints." Additionally, commercial payors had expressed concerns regarding the size of the studies and the small population of potential patients who would need gammaCore. "The payors said, 'We don't really need this.'"

132.    CW3 also added that electroCore had to remove chronic patients to demonstrate a statistically significant benefit for treating patients with episodic cluster headaches and that against FDA guidance electroCore combined chronic and episodic patients in the same trials.

133.    CW3 maintained that the Company's contention that electroCore had existing agreements with commercial payors that would provide 17 million patients reimbursement was not accurate and was founded on "some confusion about an agreement they thought they had with CVS" and later "got additional clarification that they weren't on [CVS's] template formulary" and "at best" would have access to a "few million lives." CW3 continued that, "I believe [the Company] was probably reticent after they made public statements, they were reticent to retract it. I think they probably should have. I don't think they were being completely accurate."

134.    Additionally, CW3 stated that the Registration Statement also did not reveal that gammaCore was ineligible for a Healthcare Common Procedure Coding System ("HCPCS") code and that it could have also been ineligible for an E-Code for Durable Medical Equipment and that these facts would likely make it harder to secure agreements with commercial payors. CW3 further stated that "[t]he problem [was] that codes are only issued once a year. So you have to have your request for a code submitted before January 2020 to get a code effective [for] 2021. It takes a year

for a code to be issued" and explained that due to the durability of the device gammaCore failed to meet the requirements for an E-Code and did not receive the E-Code classification.

135.    CW3 also explained that to bypass the arduous coding process, the Company attempted to secure reimbursement for gammaCore as a pharmacy benefit, but because it is not a drug, gammaCore was not given a National Drug Code from the FDA. Instead, the Company was forced to request a unique identifier from the National Council for Prescription Drug Programs, which First Databank, Inc. ("First Databank"), the largest database used by commercial payors, does not list those with drug codes. Rather, this former employee explained, First Databank had a unique database for devices that were required to be purchased separately. CW3 stated "[s]o, you would have a payor who said, 'We'd like to cover [gammaCore], but we can't find it in the database.'"

136.    CW3 also stated that a draft of the Registration Statement initially included information regarding gammaCore's lack of eligibility for the HCPCS code and potential ineligibility for the E-Code for Durable Medical Equipment, but that it was taken out prior to filing with the SEC. CW3 expressed concerns pertaining to the removal of that information to Duhart and believed that Defendant Amato was also informed. In October 2018, CW3 raised the issue while at a dinner with Defendant Amato and Duhart.

137.    CW3 stated that, "I think that they didn't provide investors with all the information they had and knew and had available to them when they filled out the S-1 document." "My belief was that in the S-1 document, electroCore should have stated that they were aware that gammaCore may not fit the definition of Durable Medical Equipment, which would mean it may not be eligible for a unique E-Code under the HCPC system. And that, in my estimation, I thought that was extremely important to people who were going to invest in the company, and it was just ignored,

completely ignored." CW3 continued, stating that "[w]hat we wanted to do was for the doctor to submit the prescription so there would be a record of a request for a patient to [use gammaCore]. And in that way, we would demonstrate [to payors] that we were creating demand."

138.     According to CW3, when Duhart initiated the voucher program in March or April of 2018 that process changed. Instead, patients were given the gammaCore device for free for one to two months, thereby completely circumventing commercial payors. Now, "[t]he doctor wrote the prescription, the prescription went into our people who were doing distribution at Asembia, and they would ship the device. But the payor never saw that because you were giving them a free device." CW3 further stated that "[w]hen we changed to the voucher program, all that happened was a dispensing pharmacy sent a device to a patient, but the insurance company was never billed. So now you haven't created any demand" and that "[the Company] gave away a hell of a lot of gammaCore but you didn't end up with any payors covering it."

139.     CW3 described the method that electroCore utilized to determine pricing as "backward" stating that, "[w]ith no market input, no focus groups, no payor strategy groups, none of that. It was really done backward. 'How much money will we need in order to have a successful IPO?' They worked the pricing of it backward." Since the patient was paying for the device whether they suffered from headaches or not, this employee cast the pricing model as "more like a subscription than a prescription."

140.     Per CW3, Defendant Amato rejected Duhart's request to take on additional sales representatives stating, "[w]e don't have any business. We're not generating revenue with the reps we have. We need to cut back."

141.     A former Company employee who worked as a Strategic Business Consultant between January 2015 and September 2018, referred to as "CW4" in the Securities Class Action,

stated that the Company "went public before they had any payors on board. I don't think anyone was going to pay $500" to use gammaCore.

142.    Another former Company employee who worked at the Company's headquarters in New Jersey as electroCore's Vice President of Clinical Operations between December 2018 and August 2019, referred to in the Securities Class Action as "CW5," stated that in May 2019, electroCore laid off nearly 50% of its workforce which forced certain clinical trials to come to a halt. This former employee stated that "[t]hey hadn't received approvals for their device. They kept blaming [the layoffs] on the uptake with the insurance companies and not getting coverage for the device as quickly as expected."

143.    CW5 recalled discussions at bi-monthly senior manager meetings pertaining to attempts to secure agreements with insurance companies and explained that insurance companies only provide limited time periods during each year when companies like electroCore could arrive at an agreement and that if that time period lapsed the Company would need to wait until the following year, further stating "[i]t's not like with an oncology drug where you get the attention of the insurance companies right away."

144.    CW5 stated that because the Company had been in the midst of attempting to determine the ideal patient profile to benefit from gammaCore and that and it was a challenge to find additional subgroups of patients who would benefit from its use, the Company was struggling to reach agreements with insurance companies.

145.    A former Company employee, referred to in the Securities Class Action as "CW6," worked as electroCore's Senior Territory Business Manager between May 2018 and April 2019 and regularly met with doctors to persuade them to prescribe gammaCore. CW6 reported to the Regional Business Director who then reported to both Duhart and Defendant Amato. CW6 stated

that failing to reach agreements with insurance companies and also that gammaCore was not listed on any formularies, "was probably the demise." According to CW6, approximately 80% of the doctors with whom this former employee met were inclined to prescribe gammaCore, but for the fact that gammaCore was not covered by insurance. Although a small portion of those doctors would go the extra mile to submit a letter on behalf of their patients, even in those cases insurers would only cover the cost of gammaCore about 10% of the time.

146.    CW6 mentioned that Duhart ran national sales conference calls every quarter and on those calls offered updates on electroCore's attempts to secure agreements with insurance companies. Although Duhart had mentioned that an agreement with CVS was close, it was not finalized prior to that employee leaving the Company, stating "[i]t was the same message every time we would be on national conference calls. 'We're still trying. We're real close.' That was pretty much it."

147.    CW6 also stated that they, along with other sales representatives, mentioned to Duhart as well as other senior leadership at the Company that, "[w]e have doctors that do want to prescribe [gammaCore], but their patients can't afford $500 a month. That was a broken record." CW6 concluded that "[i]t doesn't take a rocket scientist to figure out that you can't keep giving away products and not getting coverage for it. We all knew that if we didn't get coverage, if there's no coverage, the company's not going to be able to sustain."

Contrary to electroCore's Characterization, the Company's Additional Use Clearance and Trials had not been Advancing

148.    Another former Company employee, referred to in the Securities Class Action as "CW7," was based out of the Company's headquarters in New Jersey and worked as electroCore's Director of Clinical Affairs between April 2018 and February 2019. CW7 worked directly under and with Senior Vice President of Neurology, Eric Liebler ("Liebler"), who reported to Defendant

Amato. CW7 was in charge of clinical studies, and worked on the PREMIUM II trial, which was meant to expand gammaCore's use to prevent migraines. As of February 2019, according to CW7, the Company did not have sufficient data to demonstrate that gammaCore was effective in preventing migraines.

149.   CW7 recalled frequent face-to-face discussions with Liebler pertaining to the trial and met weekly to discuss updates. The typed minutes taken by one of them during those meetings were stored in a Google document on the Company's internal database. CW7 also stated that, during weekly meetings, Liebler would present updates on the trial to electroCore's senior management and Board members including, among others, Defendants Amato, Vraniak, and J. Errico.

150.   CW5 also voiced concerns over the PREMIUM II trial with the statistician the Company had hired to advise electroCore on the trial who was a colleague of Liebler, and that this statistician seemed to have been trying to please Liebler which might have affected the quality of the trial and, particularly, the data that was recorded. CW5 and two additional members of the Clinical Operations team, raised concerns in March 2019 during a "lengthy discussion" with Tony Fiorino ("Fiorino") upon Fiorino taking the helm as the Company's Chief Medical Officer ("CMO"). Despite that conversation, the Company failed to make any changes by the time this former employee parted ways with the Company in August 2019.

151.   CW5 described it as "odd" that Liebler was the primary FDA contact since, from this former employee's experience working for other companies, typically a Regulatory Affairs employee was the point of contact. From discussions with Liebler, this former employee recalled that the FDA, in fact, had brought up concerns relating to the strength of the Company's data to support the use of gammaCore as preventative of migraines.

152.    CW3 also stated that electroCore did not have adequate data to determine the efficacy of gammaCore for migraine prevention as of January 2019 since the PREMIUM II trial was still in progress.

### Post IPO Leadership Changes

153.    Following the IPO, the Company experienced a string of dubious leadership changes. On March 8, 2019, the Company announced that Defendant Vraniak had resigned from his position as CFO with electroCore "to pursue other professional opportunities." Further, the Company announced that it had appointed Defendant Posner as the CFO to be his replacement. Additionally, the Company announced that Staats would transition from the Company's CMO to the Senior Executive Advisor of Medical and Government Affairs and that Fiorino would replace him as CMO.

154.    On June 4, 2019, the Company announced that it had entered into Separation and Release Agreement with Defendant J. Errico on May 31, 2019. Pursuant to the separation agreement, Defendant J. Errico stepped down as the Company's CSO (but remained in his role as a Company director), in consideration for, *inter alia*, a lump sum payment in the amount of $581,000.

155.    On June 10, 2019, electroCore announced that Defendant Amato had resigned as the Company's CEO, but that he would remain with the Company for a "transition period." Also that day, the Company entered into a Separation and Release Agreement with Defendant Amato, pursuant to which he would be entitled to, *inter alia*, a lump sum payment in the amount of $800,000.

**Individual Defendants' Knowledge**

156.    Due to the false and misleading statements in the Offering Documents, described herein, Defendants Amato, Vraniak, J. Errico, T. Errico, Cox, Atieh, Colucci, Moody, Ondra, Ross, Rubin, and Tullis guaranteed a successful IPO in which the Company was permitted to sell over 5.9 million shares of common stock at $15.00 per share, profiting approximately $83.4 million. At the time, these funds were necessary for the Company to continue its operations since, as of March 31, 2018, electroCore had just $1.5 million in cash and cash equivalents.

157.    As described herein, the Company is very small, as it only employed approximately 64 employees when the Company went public, a figure that dropped to 51 in May 2019, albeit after a brief increase in size in the beginning of that year. Thus, the challenges electroCore faced prior to, during, and following the IPO could not have escaped the Individual Defendants' attention, as it concerned the Company's primary treatment. Indeed, Defendants J. Errico and T. Errico co-founded the Company and certain of the Individual Defendants have served at the Company for many years before the IPO. Notably, the Company's management team was described as "[h]ighly experienced" and even highlighted as a competitive strength prior to the IPO. The Registration Statement stated:

> Our management team includes a diverse group of executives with significant experience in senior positions in the pharmaceutical and medical device industries, including positions at Pfizer Inc, Merck & Co., Novartis International AG, Stryker Corporation and Zimmer Biomet. Members of our team have been involved in the launch and marketing of products including Motrin, Celebrex, and the migraine drugs Axert and Maxalt. Our team's pharmaceutical experience in clinical development, sales, marketing and reimbursement, and its medical device experience in research, development and regulatory affairs, allow us to pursue our strategy and growth plans.

158.    Moreover, Defendants Amato, Vraniak, Posner, and J. Errico conceded knowledge of the Company's business via various earnings calls held by the Company.

159.    For instance, on the earnings call held in November 2018 to discuss the Company's financial results for the period ended September 30, 2018, Defendant Amato stated the following, in relevant part:

> So where are we with the commercial payers and PBMs? ***Currently we have multiple reimbursement agreements in place. The first of which is the CVS Caremark agreement, which will go into effect on January 1, 2019. Under this agreement, we have been advised that approximately 30 million of the 65 million U.S. individuals managed by CVS Caremark will have access to our therapy as a Tier 3 product beginning in January of 2019***. Potential access to the remaining 35 million lives will be gained through continuing negotiations with the payers within the CVS network.

(Emphasis added.)

160.    In March 2019, during an earnings call held to discuss the Company's financial results for the year ended December 31, 2018, Defendant Vraniak stated the following, in relevant part:

> As Frank noted earlier, the majority of gammaCore prescriptions during the quarter were dispensed under promotional programs. As a result, we're proud to report that we've delivered an additional $1.7 million of product sales value of gammaCore therapy to patients through our promotional programs …. This includes vouchers or free therapy and co-pay assistance. Through our co-pay assistance program, we assist patients who have obtained commercial coverage with up to $100 of their co-pay at the time that gammaCore dispensed. We continue to believe these programs are accomplishing our objectives of providing patient therapy at no charge, demonstrating the benefits of gammaCore therapy to physicians who write prescriptions and promoting U.S. commercial payer coverage and coverage discussions as a result of patient and physician demand.

161.    During the same call, Defendant J. Errico stated the following, in relevant part:

> As we've shared before, medical researchers the world over are busy studying vagus nerve stimulation for a variety of elements. This interest is the result of the ever growing body of scientific research demonstrating the potent effects of VNS, neurotransmitters, inflammatory mediators, metabolic signaling proteins and even on clotting factors. Translating this potential into the clinic and into commercial success ultimately requires payer reimbursement approval. And payers demand evidence based clinical presentations supported by peer reviewed publications. Fortunately, published clinical data is the cornerstone of our payer outreach efforts and in furtherance of this, I'd like to highlight one paper we recently announced

that was published in the highly regarded Journal of the Headache and Pain, which is a retrospective study of chronic and episodic cluster patients who were using gammaCore for at least three to six months. … On the clinical front, we are working hard to follow up our third label claim, which we received this past year for the prevention of cluster headache. With the clinical data to getting clearance for the potential label claim for the prevention of migraines. To this end, we are in ongoing discussions with FDA around an application that we plan to submit to support this label. Providing additional support for that indication will be our PREMIUM II trial, which is designed to extend the findings from our prior PREMIUM I trial. It will enroll up to 500 patients in 35 sites across the United States and it began enrollment in the fourth quarter of last year. … Yes, Marie, this is J.P. The answer to that question is at the present time, it appears to be around 30% to 35%, but it's growing and it's growing rather significantly. We believe that the reason for that is because as the payers come online, the cost or outlay that the patient has to take on in order to remain on therapy is reduced. And so as a result, we saw 300% increases, as Frank mentioned, quarter-over-quarter from third to fourth quarter in refills and we expect and anticipate that to continue to grow into the first quarter and so, I would caution taking anything that I'm saying right now as what it's going to be going forward, because these numbers continue to grow.

162.    Further, on an earnings call held in May 2019 to discuss Company's financial results for the period ended March 31, 2019, Defendant Posner stated the following, in relevant part:

Due largely to the timing of new coverage decision, on the part of CVS Caremark, the Federal Supply schedule and others that commence reimbursement in the first quarter of 2019 as well as continued growth in unique prescribers and the ongoing conversion of promotional scripts to be reimbursed, we continue to anticipate that revenue for 2019 we'll be back-end weighted.

163.    Given the small size of the Company and gammaCore's importance to the operations and viability of electroCore's business as its lead product and only source of revenue, and that the Company was strapped for cash, in conjunction with certain of the Individual Defendants' admissions of knowledge as to the core operations of the business, the Individual Defendants knew, or were reckless in not knowing, non-public material facts pertaining to gammaCore.

164.    As illustrated by CW3, CW5, CW6, and CW7 herein and in the Securities Class Action, the Individual Defendants attended frequent Company meetings or smaller person-to-person meetings during which they were informed about critical facts and/or were able to access certain Company reports containing important information that was invariably concealed from investors in the statements set forth below.

165.    Specifically, for instance, CW3 gave Defendant Amato regular briefings relating to CW3's discussions with commercial payors and also talked about the code eligibility problem with Defendant Amato in face-to-face meetings. CW5 revealed that senior managers attended bi-monthly meetings during which electroCore's attempts to secure contracts with insurance companies were reviewed. According to CW6, Duhart, who reported directly to Defendant Amato, led national sales conference calls every quarter. According to CW7, the Company held meetings each week on, *inter alia*, the Company's clinical trials and those meetings were attended by the Company's officers and directors.

166.    Additionally, CW5 disclosed that during the senior manager meetings, which were held twice per month at the Company's Basking Ridge building, Defendant Amato received updates from all of electroCore's functional groups including Commercial, Sales, Clinical Supply/Device Supply, and Clinical Operations. CW5 stated that CW5 was present at those meetings before the Company laid off employees in May 2019. CW5 additionally revealed that Defendant Amato met with Liebler in Defendant Amato's office each week.

167.    CW6 stated that the Company's distributor, Asembia, kept a portal displaying key figures related to gammaCore, including the amount of vouchers submitted for gammaCore, prescriptions dates, as well as status updates pertaining to requests for coverage. Consequently,

Defendants Amato, Vraniak, Posner, J. Errico, T. Errico, Cox, Atieh, Colucci, Moody, Ondra, and Tullis had access to this data.

168.   As detailed herein, while in possession of material, nonpublic information regarding gammaCore's issues, Defendant J. Errico sold 100,000 shares of electroCore stock during the Relevant Period, realizing net proceeds of approximately $535,270. Defendant J. Errico had not sold any shares of electroCore before January 15, 2019. Therefore, Defendant J. Errico was motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts to inflate the price of the Company's common stock and increase his personal gains. Defendant J. Errico's insider sales were questioned by an analyst from Evercore ISI during the May 2019 earnings call, who stated:

> And then last question I have to ask because a few investors have expressed dismay over [Defendant Errico] initiating stocks don't plan at the time of the stock is so far below the IPO price. So perhaps, you can address why you felt that this prudent timing, considering the poor optics and why we shouldn't take that as a lack of confidence and the outlook for the Company at the current valuation?

**The Individual Defendants' Duty to Disclose**

169.   SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as electroCore, with respect to their finances and operations. Specifically, Item 303(a)(3) of Regulation S-K required electroCore to:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price

increases or inventory adjustments), the change in the relationship shall be disclosed.

170.    Additionally, Item 105 of Regulation S-K required the Individual Defendants to include in the "Risk Factors" section of the Offering Documents "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."

171.    As such, the Individual Defendants had a duty pursuant to Regulation S-K to disclose the fact that, *inter alia*, gammaCore did not have a competitive advantage over other drugs, that gammaCore was most often regarded as a supplemental treatment, that the Company did not have strong relationships and/or agreements in place with commercial payors, that the Company was having issues securing insurance coverage for gammaCore, that physicians were hesitant to prescribe gammaCore, that the Company was relying, unsuccessfully, on its voucher program to increase sales revenue, that, as a result, the Company's burn rate was accelerating, and, that the FDA was unlikely to approve the Company's 510(k) application in the near future, as these facts constituted: (i) unusual transactions or significant economic changes materially affecting the Company's reporting income; (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income; and (iii) significant factors that would make investing in electroCore speculative or risky.

**False and Misleading Statements**

***The Offering Documents***

172.    On May 21, 2018, before the beginning of the Relevant Period, the Company filed the Registration Statement with the SEC, in connection with the IPO. The Registration Statement was signed by Defendants Amato, Vraniak, J. Errico, Colucci, T. Errico, Moody, Ross, Rubin, and Tullis. The Company subsequently filed three amendments to the Registration Statement, and the Registration Statement was declared effective on June 21, 2018.

173.   On June 25, 2018, shortly after the Company's stock began trading on NASDAQ, the Company filed the Prospectus with the SEC, in connection with the IPO. The Prospectus formed part of and was incorporated into the Registration Statement.

174.   The Offering Documents discussed in detail the Company's gammaCore therapy, touting its competitive advantage over similar drugs. Specifically, the Offering Documents stated:

• ***Our non-invasive therapy unlocks the long-held potential of VNS.*** VNS therapy can, for the first time, be delivered comfortably through the skin using gammaCore. This eliminates the need for costly, invasive surgery that has been reserved for the most refractory patients, requiring the implantation of a permanent medical device.

• ***Commercializing our therapy through traditional pharmaceutical channels.*** Our non-invasive delivery modality permits medical professionals to prescribe VNS through the same channel they would any other specialty medication. Refills delivered on a monthly basis enable us to seek widespread commercial payor coverage and reimbursement under a traditional pharmaceutical model. We have agreements in place with commercial payors that we believe, based on our estimates, will provide for reimbursement for gammaCore as a pharmacy benefit for approximately 17 million commercial lives with such number expected to increase to as many as 45 million lives under these agreements over the next several calendar quarters.

• ***Highly scalable and low investment manufacturing with digital refills.*** Our low manufacturing and assembly costs allow us to scale to meet demand with minimal additional investment. Refills through RFID or Bluetooth may offer attractive gross margins.

• ***Potential for rapid label expansion in headache and regulatory approval in additional indications.*** In April 2017, the FDA cleared gammaCore for commercial sale in the United States and established a new therapeutic category: external vagal nerve stimulator for the treatment of headache. Through an expedited pathway, gammaCore received clearance for the acute treatment of pain associated with migraine in January 2018. We believe a similar regulatory pathway may be available to us for additional indications in rheumatology.

\* \* \*

***Highly experienced management team.*** Our management team includes executives with significant experience in the pharmaceutical and medical device industries, including positions at Pfizer Inc, Merck & Co., Novartis International AG, Stryker Corporation and Zimmer Biomet. Members of our team have been involved in the launch and marketing of products including Motrin, Celebrex, and the migraine drugs Axert and Maxalt. Our team's pharmaceutical experience in

clinical development, sales, marketing and reimbursement, and its medical device experience in research, development and regulatory affairs, allow us to pursue our strategy and growth plans.

175.    Moreover, regarding gammaCore's "advantages" the Offering Documents stated,

in relevant part, that:

Important advantages of gammaCore over other acute treatments for migraine and episodic cluster headache include its ease of use and suitability to be applied for as many attacks as a patient experiences per day, without the frequency-of-use restrictions and contraindications associated with other treatments.

176.    Regarding the key markets, i.e., the treatment for migraines and cluster headaches,

that the Company was focused on entering, the Offering Documents stated that:

Migraine is a debilitating primary headache condition characterized by severe throbbing pain or a pulsing sensation, usually on one side of the head. Migraine affects approximately 12% of the adult population globally and disproportionately impacts women of childbearing years. In the United States, there are approximately 36 million migraine sufferers. Medications used to treat migraine include triptans, ergotamines, and anti-epileptic medications. Despite the fact that neurologists recognize the limited efficacy of, and the potential for abuse associated with, opioids, this class of medication continues to be prescribed for migraine at high rates, particularly in emergency departments. According to the U.S. Pharmacist, a leading pharmacy publication, upwards of 60% of the migraine patient population is dissatisfied with, or has contraindications to, the current standard of care migraine treatments. We estimate the addressable market for the acute treatment of migraine in the United States in 2018 will be approximately $3.8 billion. Five million migraine sufferers are treated annually by approximately 1,100 U.S. headache specialists, primarily neurologists.

177.    Additionally, the Offering Documents highlighted gammaCore's versatility and

varied market applications in the following chart:

| Indication | Preclinical / Pilot Trials | Pivotal Trials | FDA Clearance | Commercial Launch [1] | Key Milestones |
|---|---|---|---|---|---|
| Acute Treatment of Episodic Cluster Headache | | | | | • FDA clearance April '17<br>• Commercial registry initiated 3Q '17<br>• Full commercial launch expected 3Q '18 |
| Acute Treatment of Migraine | | | | | • FDA label expansion January '18<br>• Full commercial launch expected 3Q '18 |
| Migraine Prevention | | | | | • Final PREMIUM trial data expected 2Q '18<br>• 2nd pivotal trial initiation expected 2H '18 |
| Migraine in Adolescents | | | | | • Pivotal trial initiation expected 2H '18 |
| Post-Traumatic Headache | | | | | • Initial preclinical studies in progress<br>• Pilot trial initiation expected 2H '18 |

178.    The Offering Documents publicized "key elements" of electroCore's strategy to develop into a market leader. Among those "key elements" were existing "agreements with commercial payors" which had supposedly secured reimbursement for gammaCore as a pharmacy benefit for approximately 17 million patients. The Offering Documents stated:

Our goal is to be a leader in bioelectronic medicine by using our proprietary non-invasive VNS platform therapy to deliver better patient outcomes. The key elements of our strategy include:

•    ***Drive acceptance of our gammaCore products as a leading headache therapy, introducing it in cluster headache and expanding into migraine.*** We plan to establish gammaCore as the first-line treatment for episodic cluster headache patients, who have few alternative treatment options available to them. We will then leverage this position to expand into the broader headache market for migraine in the third quarter of 2018.

•    ***Drive reimbursement of our therapy.*** We are actively engaging with over 50 national and regional commercial insurance payors in the United States with the goal of securing reimbursement coverage as a pharmacy benefit. We have agreements with commercial payors in place that we believe, based on our estimates, will provide for reimbursement for gammaCore as a pharmacy benefit for approximately 17 million commercial lives, with such number expected to increase to as many as 45 million lives under these agreements over the next several calendar quarters.

•    ***Build a leading commercial presence.*** We are establishing a robust commercial capacity, including a specialty distribution channel with a concierge service to quickly onboard patients and manage payor interactions, and a direct sales force to target high prescribing neurology specialists and headache centers.

179.   Similarly, regarding the "Commercialization," of gammaCore, the Offering Documents provided details on electroCore's "commercial strategy" which included existing "agreements with commercial payors" which had supposedly secured reimbursement for gammaCore as a pharmacy benefit for approximately 17 million patients which the Company emphasized was to increase to 45 million patients "over the next several calendar quarters." The Offering Documents stated:

> We believe the significant unmet need and highly-targeted market of episodic cluster headache represents an ideal entry point for our therapy into the headache market, providing an opportunity to gain relevance with treating clinicians in order to support an expansion into migraine. Our commercial strategy will initially focus on the following priorities:
>
> •   ***Drive advocacy of gammaCore as a leading headache therapy.*** Our strategy is to establish gammaCore as a preferred treatment option, initially in episodic cluster headache and expanding into migraine. We are developing advocacy for gammaCore among key opinion leaders through our clinical program and initial product registry. We currently have in excess of 300 clinicians trained on gammaCore use and over 600 unique prescribers. Of these, 50 are key opinion leaders who will lead a series of programs to educate their colleagues on our clinical data and our specialty pharmacy distributor and its national network of specialty pharmacies.
>
> •   ***Drive reimbursement of our therapy.*** Through our product registry and initial commercialization efforts we are generating prescriptions and patient claims to prompt commercial payors to initiate reimbursement policies for gammaCore. We have engaged over 50 national and regional commercial insurance payors in the United States with the goal of obtaining reimbursement coverage as a pharmacy benefit. gammaCore is currently the subject of agreements with commercial payors that we believe, based on our estimates, will provide for reimbursement for gammaCore as a pharmacy benefit for approximately 17 million commercial lives, with such number expected to increase to as many as 45 million lives under those agreements over the next several calendar quarters. In addition, our access negotiations have entered the active clinical review stage with more than a dozen additional insurance plans covering approximately 120 million additional commercial lives.
>
> •   ***Build a leading commercial presence.*** We have partnered with an established specialty pharmacy distributor to provide physician and patient.

support to quickly onboard patients and manage payor interactions. This support includes adjudication of all gammaCore prescriptions, payor claims for reimbursement, and patient support and training. Our sales force targets high-prescribing U.S. neurology practices and headache centers. We currently have a sales force of 18, with three medical science liaisons. We plan to hire an additional 14 territory business managers, who will ultimately cover 6,400 high-prescribers of headache medications.

180.    Regarding the Company's strategy, the Offering Documents further described that:

Following our initial FDA clearance, our commercial strategy has been to establish gammaCore as a first-line treatment option for episodic cluster headache patients, who have few alternative treatment options available to them. ***This strategy is supported by a product registry initiated in July 2017 to build advocacy among key opinion leaders in 55 leading headache centers in the United States, and to generate patient demand in the form of prescriptions submitted to payors. We intend to leverage this advocacy as we expand into the broader headache market for both migraine and cluster headache in the third quarter of 2018***.

* * *

As part of our broad payor engagement strategy we are seeking to secure pharmacy benefit reimbursement for our therapy by working with both commercial payors and pharmacy benefit managers, also known as PBMs. PBMs are third party groups who manage the pharmacy benefits offered by the commercial payors. In the U.S. market, there are three major large PBMs. We have entered into an agreement with one of these major PBMs, which manages approximately 60 million U.S. lives. Pursuant to this agreement, gammaCore will be covered, depending on the commercial payor that the PBM serves, and the specific plan, for commercially covered U.S. patients, as either a preferred brand or non-preferred brand. As a preferred brand, or Tier 2 product, the coverage would require a monthly copayment paid by the patient of approximately $30. As a non-preferred brand, considered a Tier 3 product, the monthly copayment would likely be between $60 and $75. Under this agreement, we anticipate, based on our estimates, that approximately 15 million U.S. commercial lives will shortly have access to our therapy as either a Tier 2 or Tier 3 product, and we anticipate this number will grow to at least 45 million lives under this agreement over the coming quarters as we, together with this PBM, engage with additional commercial payors to position our product across the payors' plans. The strategy of engaging with payors and PBMs is continuing as we engage the other major PBMs and payors towards the goal of increasing patient access to our therapy.

(Emphasis added.)

181.    The Offering Documents explained that electroCore's rising costs and expenses were due to the Company's claimed attempts at "commercialization" of gammaCore:

In anticipation of clearance from the FDA and commencement of commercial sales in the United States, we incurred a significant increase in compensation costs as additional personnel were hired to oversee the execution of the commercial plan in the United States and Europe. Significant expenses include costs associated with marketing and advertising, salesforce, professional fees for legal services, including legal services associated with our efforts to obtain and maintain broad protection for the intellectual property related to our products, rent, compliance, payor reimbursement development, accounting services, and consulting fees.

\* \* \*

Research and development expenses increased $0.6 million to $2.3 million for three months ended March 31, 2018, from $1.7 million for the three months ended March 31, 2017. This increase was primarily the result of an increase in headcount and increased compensation expenses related to personnel of $563.0 thousand, an increase in research studies of $200.0 thousand, which was offset by a decrease in other related expenses. We plan to increase our research and development expenses in 2018 to support product development, product enhancements and future clinical studies, to further develop and update our existing technologies and to expand our gammaCore therapy for the treatment of other indications, including additional headache conditions and rheumatology.

182.    With regard to net sales of gammaCore, the Offering Documents stated, in pertinent part:

In February 2018 we began a formal physician training program highlighting the clinical evidence and benefits of gammaCore for the acute treatment of pain associated with migraine and episodic cluster headache. Concurrently, to incentivize these physicians to issue prescriptions and increase market penetration, we began a voucher program providing new patients with a one-time 31-day therapy at no charge to the patient. While the voucher program has increased demand, the transaction price for each unit sold through the voucher program is reduced by the amount of the one-time free 31-day therapy which offsets the effects of the increased demand for gammaCore. Our revenue reflects only gammaCore units sold either for new patients, or existing patients refills, that are not related to our voucher program.

183.    Although the Company had disclosed weakening sales revenues in the first fiscal quarter of 2018, electroCore explained that this trend would be temporary, since it was attributable to the Company's voucher program instead of the increased competition. The Offering Documents further stated:

Net sales decreased $35.7 thousand to $81.2 thousand for three months ended March 31, 2018, from $116.9 thousand for the three months ended March 31, 2017. The decrease is primarily due to a reduction in the transaction price related to the cost of voucher program and the co-payment assistance program. Net sales are not recognized for gammaCore units redeemed, or estimated to be redeemed under the Company's voucher program.

184.    The statements in ¶¶ 172-183 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) gammaCore did not benefit from competitive advantages over other treatments for episodic cluster headaches and migraines; (2) in fact, electroCore faced fierce competition due to increasing pricing pressure and a lack of insurance coverage; (3) gammaCore was typically not thought of as a primary treatment for migraines, but rather as a supplemental treatment; (4) electroCore's agreements and relationships with insurance companies and commercial payors were limited; (5) the Company was struggling to obtain insurance coverage for gammaCore; (6) therefore, since reimbursement would be difficult, physicians were hesitant to prescribe gammaCore; (7) the Company was forced to devote substantial resources to help physicians regarding insurance coverage, thereby increasing electroCore's expenses; (8) electroCore unsuccessfully relied on promotional programs such as its voucher program to increase sales when those programs were actually having a negative effect on reimbursement by payors, causing the appearance that gammaCore was utilized more often than it was; (9) the foregoing programs required considerable cash outlays, which hastened the Company's burn rate, rendering electroCore's commercial approach untenable; (10) the Company's clinical data was insufficient to demonstrate that gammaCore was effective and safe for migraine prevention and the FDA had raised concerns to that effect; and (11) the Company's senior leadership including, but not limited to the CEO and CFO,  were prepared to step away from

electroCore shortly following the IPO. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### August 13, 2018 Press Release

185.   On August 13, 2018, the Company issued a press release in connection to the release of its financial results for the second fiscal quarter of 2018. The press release stated, in relevant part:

### Second Quarter 2018 and Recent Highlights

• Second quarter net sales was $393,000, an increase of $217,000 over second quarter of 2017
• Completed initial public offering of our common stock, receiving net proceeds of approximately $77.7 million after deducting underwriting discounts, commissions and offering costs

\* \* \*

"I am encouraged by our second quarter financial results," said Frank Amato, Chief Executive Officer. "I believe our successful IPO will not only enable us to expand our commercial presence, but also allows us to build upon our growing list of positive clinical studies."

**Second Quarter Financial Results**

Net sales for the three months ended June 30, 2018 increased $217,000 from the second quarter of 2017. The growth in sales was due to an increase in the company's sales force and the January 29th FDA clearance for an expanded label for gammaCore as an acute treatment for pain associated with migraine in adult patients.

Gross profit for the second quarter of 2018 was $153,000, up from $138,000 in the same period of the prior year.

Total operating expenses for the second quarter of 2018 were $16.4 million, an increase of $8.8 million compared to the same period in 2017. The increase in operating expenses was driven primarily by costs related to expansion of the company's sales and additional stock based compensation expense, due to the corporate conversion.

Operating loss in the second quarter of 2018 was $16.2 million, as compared to an operating loss of $7.4 million in the second quarter of 2017.

Cash, cash equivalents, and short-term investments were $95.8 million as of June 30, 2018.

***August 14, 2018 Form 10-Q***

186.    On August 14, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendants Amato and Vraniak and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Amato and Vraniak attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2Q18 10-Q reiterated the financial results disclosed in the August 2018 press release.

187.    The statements in ¶¶ 185-186 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) gammaCore did not benefit from competitive advantages over other treatments for episodic cluster headaches and migraines; (2) electroCore unsuccessfully relied on promotional programs such as its voucher program to increase sales when those programs were actually having a negative effect on reimbursement by payors, causing the appearance that gammaCore was utilized more often than it was; (3) the foregoing programs required considerable cash outlays, which hastened the Company's burn rate; and (4) the Company had insufficient revenue which rendered electroCore's commercial approach untenable. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

***November 13, 2018 Press Release and Earnings Call***

188.    On November 13, 2018, the Company issued a press release which was attached to a current report filed with the SEC on Form 8-K and held an earnings call to discuss its financial results for the third fiscal quarter of 2018. The press release stated, in pertinent part:

**Third Quarter 2018 and Recent Highlights**

• Generated 4,516 gammaCore® prescriptions in the third quarter of 2018, with over 11,000 prescriptions written as of October 31, 2018
• Nearly 1,500 unique prescribing physicians through the third quarter of 2018, an increase of 48% from the second quarter
• Launched reloadable and rechargeable gammaCore Sapphire across the U.S. market
• Submitted 510(k) application to the FDA for the prevention of cluster headache
• ***Commercial payer coverage for 35 million lives beginning in the first quarter of 2019***
• National Institute of Health and Care Excellence (NICE) publication advising gammaCore for the treatment of cluster headache in the U.K.

"We are pleased with our performance in the third quarter and are encouraged by the positive prescription trends we are generating while we progress forward several clinical and strategic initiatives," said Frank Amato, Chief Executive Officer. "***With continuing discussions and negotiations for payer coverage for an additional 90 million lives, and our increasing base of prescribing physicians, we are well positioned for gammaCore to be an early option for patients suffering from migraine and episodic cluster headaches***."

**Third Quarter Financial Results**

electroCore recognized $150,972 in net sales for the three months ended September 30, 2018. The decrease in net sales of $132,267 versus the third quarter of 2017 contrasts ***with the significant increase in prescriptions during the same period as a result of a vast majority of prescriptions being dispensed under our patient voucher and copay assistance programs, as the Company continues negotiations with commercial payers for formulary coverage of gammaCore. The Company expects this trend to be temporary, as increased numbers of patients are expected to obtain commercial prescription coverage for gammaCore starting in January 2019***. The Company dispensed approximately $1.7 million in product sales value to patients through the patient voucher program.

Gross profit for the third quarter of 2018 was $53,905, down from $154,921 in the same period of the prior year.

Total operating expenses for the third quarter of 2018 were $13.6 million, an increase of $7.5 million compared to the same period in 2017. The increase in operating expenses was driven primarily by costs related to expansion of the company's sales and marketing functions.

Operating loss in the third quarter of 2018 was $13.2 million, as compared to an operating loss of $12.4 million in the third quarter of 2017.

Cash, cash equivalents, and short-term investments were approximately $80.5 million as of September 30, 2018.

(Emphasis added.)

189.   During the earnings call that the Company held that same day, Defendant Amato stated the following, in relevant part, regarding electroCore's purported agreements with commercial payors:

So where are we with the commercial payers and PBMs? ***Currently we have multiple reimbursement agreements in place. The first of which is the CVS Caremark agreement, which will go into effect on January 1, 2019. Under this agreement, we have been advised that approximately 30 million of the 65 million U.S. individuals managed by CVS Caremark will have access to our therapy as a Tier 3 product beginning in January of 2019***. Potential access to the remaining 35 million lives will be gained through continuing negotiations with the payers within the CVS network.

(Emphasis added.)

190.   Additionally, Defendant Vraniak stated the following with respect to the Company's financial results and its voucher program:

For the quarter ending September 30, 2018, we reported GAAP revenue of $150,972, a decrease of $132,267 from the third quarter of 2017. ***This decrease is primarily due to the contra-revenue remaining as a result of our voucher program that extended into mid-July. Under this voucher program through mid-July, we would reimburse the specialty pharmacy for patient cost of gammaCore therapy at the time of dispense. This would be the basis for recognizing contra-revenue against products sold previously to our distributor***. In mid-July, we shifted to the use of a free voucher program free voucher units, thereby, eliminating the need to reimburse the pharmacy for patient cost and the need to book contra-revenue. The cost of these units dispensed under the voucher program after mid-July will then book to promotional expense. And in this way, it appears much more like a sample program.

(Emphasis added.)

### November 14, 2018 Form 10-Q

191.    On November 14, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Amato and Vraniak and contained SOX certifications signed by Defendants Amato and Vraniak attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 3Q18 10-Q reiterated the financial results disclosed in the November 2018 press release.

192.    The statements in ¶¶ 188-191 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) gammaCore did not benefit from competitive advantages over other treatments for episodic cluster headaches and migraines; (2) gammaCore was typically not thought of as a primary treatment for migraines, but rather as a supplemental treatment; (3) electroCore's agreements and relationships with insurance companies and commercial payors were limited; (4) that the Company experienced various problems with payor formularies and diagnostic codes which hindered the securement of payor reimbursement agreements; (5) electroCore unsuccessfully relied on promotional programs such as its voucher program to increase sales when such programs were actually having a negative effect on reimbursement by payors, causing the appearance that gammaCore was utilized more often than it was; (6) the foregoing programs required considerable cash outlays, which hastened the Company's burn rate and; (7) the Company had insufficient revenue which rendered electroCore's

commercial approach untenable. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### March 27, 2019 Press Release and Earnings Call

193.    On March 27, 2019, the Company issued a press release which was attached to a current report filed with the SEC on Form 8-K and held an earnings call to discuss its financial results for the fourth fiscal quarter and full fiscal year of 2018. The press release stated, in pertinent part:

> *"During the fourth quarter, we continued to execute on our commercial growth plan, led by our ongoing progress toward increasing covered lives through productive discussions with national and regional payers,"* said Frank Amato, Chief Executive Officer of electroCore. *"Notably, our fourth quarter results do not reflect the addition of covered lives from CVS Caremark, Highmark and the recently announced Federal Supply Schedule contract, all of which commenced reimbursement of gammaCore® beginning in the first quarter 2019. Our leading indicators in our approved indications of migraine and cluster headache – which together represent a four billion dollar market opportunity – are very strong, and coupled with our R&D initiatives targeting additional indications in headache conditions and rheumatoid arthritis, we believe we have established a solid foundation from which to drive future growth*. Vagus nerve stimulation represents an effective, drug-free and non-invasive alternative treatment modality that we believe has broad clinical utility across a range of underserved medical conditions, and we intend to make gammaCore® the therapy of choice for patients who stand to benefit from this innovative therapy."

**Fourth Quarter and Full Year 2018 Financial Results**

For the quarter ending December 31, 2018, electroCore reported net sales of $368 thousand, an increase of $134 thousand from the fourth quarter of 2017 and an increase of $217 thousand from the third quarter of 2018, reflecting increased sales of gammaCore Sapphire.

Total operating expenses for fourth quarter of 2018 were $15.9 million, which is an increase of $8.4 million compared to the same period in 2017 and an increase of $2.3 million from the third quarter of 2018. The increase in operating expense was driven primarily by costs related to the expansion of the company's sales and marketing functions.

Operating loss for the fourth quarter of 2018 was $15.7 million as compared to an operating loss of $7.5 million in the fourth quarter of 2017 and $13.6 million in the third quarter of 2018.

For the full year, net sales were $993 thousand, a 22% increase as compared to $811 thousand for the full year 2017. This increase in net sales is attributable to higher prescriptions as a result of the full commercial launch of gammaCore in the U.S.

Full year 2018 gross profit was $414 thousand as compared to $293 thousand for the full year 2017.

Total operating expenses were $55.0 million for the full year 2018 as compared to $25.9 million for the full year 2017. The increase in operating expense was driven primarily by costs related to the expansion of the company's sales and marketing functions.

Operating loss for the full year 2018 was $54.6 million as compared to an operating loss of $25.6 million for the full year 2017.

Cash and cash equivalents and marketable securities at December 31, 2018 totaled $68.6 million.

(Emphasis added.)

194.     During the earnings call that the Company held that same day, Defendant Amato stated the following, in relevant part, regarding electroCore's supposed successful business approach:

We've made significant progress since our initial public offering in June 2018, building a commercial infrastructure to drive awareness of gammaCore amongst payers, physicians and patients. And today, I'm pleased to say that these efforts have begun to establish a solid foundation for future growth. I'll begin with a few highlights from the fourth quarter and full year.

During the fourth quarter of 2018, there were more than 5800 prescriptions written, an increase of 30% over the third quarter. Momentum continued building into the fourth quarter with a favorable ramp. ***However, these results have yet to reflect the positive effect reimbursement will have for gammaCore, which largely started in this year. Reimbursement that includes individuals managed by CVS Caremark, Highmark, as well as the Federal Supply Schedule and more specifically the Veterans Administration and Department of Defense***.

*Our reported fourth quarter 2018 GAAP revenue was $368,000. We also dispensed approximately $1.7 million worth of gammaCore prescriptions pursuant to ongoing promotional programs. These programs are designed for patients who do not yet have reimbursement, otherwise known as demand revenue*. As such the potential demand product sales value of gammaCore prescriptions dispensed during the fourth quarter of 2018 was approximately $2.1 million.

\* \* \*

*Strategically building out the sales team through 2020 with the capability to reach 10,000 target physicians. We noted this expansion on our third quarter call, and I'm pleased to say that we remain on track to achieve this goal*.

\* \* \*

*Key to on our ongoing growth is continued expansion of insurance coverage or reimbursement among commercial payers. We remain on track to achieve 75 million covered lives by the middle of this year and 100 million by the end of the year. We had an impressive quarter-over-quarter growth in covered lives over the past two quarters. From 33 million in Q3 with an additional 21 million in Q4 and 5 million more we just announced recently, adding up to the approximate 60 million covered lives that we currently have in the United States.*

(Emphasis added.)

195.   Additionally, regarding the Company's promotional programs including its

voucher program, Defendant Vraniak stated the following:

As Frank noted earlier, the majority of gammaCore prescriptions during the quarter were dispensed under promotional programs. As a result, we're proud to report that we've delivered an additional $1.7 million of product sales value of gammaCore therapy to patients through our promotional programs.

This includes vouchers or free therapy and co-pay assistance. Through our co-pay assistance program, we assist patients who have obtained commercial coverage with up to $100 of their co-pay at the time that gammaCore dispensed. *We continue to believe these programs are accomplishing our objectives of providing patient therapy at no charge, demonstrating the benefits of gammaCore therapy to physicians who write prescriptions and promoting U.S. commercial payer coverage and coverage discussions as a result of patient and physician demand*.

(Emphasis added.)

196.     In response to a question from an analyst from Evercore regarding the Company's burn rate, Defendant Amato responded by stating the following:

> Yes, I think you've hit the nail on the head. When Glenn references a $4 million a month cash burn, that's an average burn for the year we expect. We've had that burn up until this point for the most part, that is outflows what Glenn is reporting on. So that's what our expenses are going to be. With respect to revenue that comes in to offset some of that burn, we do expect that to be sequential and accelerated through the year, as I mentioned on the call earlier.
>
> **So, when we have some of this reimbursement that will come through for CVS Caremark, Highmark, also the federal supply schedule and any new PBMs and/or commercial insurance plans that we're expecting this year, additional Blue Cross Blue Shield plans to be exact, that will offset to a great degree some of that burden**.
>
> I just want to add one other comment in here, and that is, although the burn will be on average monthly $4 million, we'll have months where we'll pay bonuses to the sales force and to folks in headquarters, and that'll pop up here and there on a monthly basis. But on average, we expect a $4 million outflow on expense or cash burn for the Company.

197.     The statements in ¶¶ 193-196 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) gammaCore did not benefit from competitive advantages over other treatments for episodic cluster headaches and migraines; (2) gammaCore was typically not thought of as a primary treatment for migraines, but rather as a supplemental treatment; (3) electroCore's agreements and relationships with insurance companies and commercial payors were limited; (4) that the Company experienced various problems with payor formularies and diagnostic codes which hindered the securement of payor reimbursement agreements; (5) electroCore unsuccessfully relied on promotional programs such as its voucher program to increase sales when such programs were having a negative effect on reimbursement by payors, causing the appearance that gammaCore was utilized more often than it was; (6) the foregoing programs required considerable cash outlays which hastened the Company's burn rate

and; (7) the Company had insufficient revenue which rendered electroCore's commercial approach untenable. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### March 28, 2019 Form 10-K

198.    On March 28, 2019, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Amato, Vraniak, J. Errico, Atieh, Colucci, Cox, T. Errico, Moody, Ondra, and Tullis, and contained SOX certifications signed by Defendants Amato and Vraniak attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

199.    Like the Offering Documents, regarding the Company's supposed "competitive strengths," the 2018 10-K similarly stated the following:

**Competitive Strengths**

We believe the competitive strengths of our company and our novel and proprietary self-administered bioelectronic therapy include:

• *Innovative bioelectronic medicine approach.* Our gammaCore therapy uses a proprietary electric signal to safely deliver bioelectronic medicine, which causes targeted pharmacologic-like changes in neurotransmitter expression and in the immune system, without systemic exposure to exogenous chemicals, in a manner that has been shown to have minimal side effects through clinical studies encompassing thousands of patients (several of which are more fully described herein).

• *Our non-invasive therapy unlocks the long-held potential of VNS.* VNS therapy can, for the first time, be delivered safely and comfortably through the skin using gammaCore. This eliminates the need for costly, invasive surgery that requires the implantation of an expensive medical device. VNS therapy is no longer reserved for the most refractory patients, and is now a first-line treatment option.

70

• ***Commercializing our therapy through traditional pharmaceutical channels.*** Our monthly prescription model, made possible by our noninvasive delivery modality, empowers medical professionals to prescribe nVNS on a monthly basis through the same channel they would prescribe any other specialty medication. Our RFID refill card enables us to offer nVNS therapy on a monthly basis, at the price of a branded pharmaceutical, which is typical of a traditional drug reimbursement model managed by pharmacy benefit managers and other commercial payers. Beginning in the first quarter of 2019, we have agreements with commercial payers and the Federal Supply Schedule (Veterans Administration and Department of Defense) that we estimate provide reimbursement of gammaCore for approximately 53 million lives. Although there can be no assurance of success, we continue discussions with additional payers and PBMs regarding up to an additional 90 million lives in the United States with a goal of securing reimbursement for an aggregate of 75 million lives in the United States by the beginning of the third quarter of 2019, and an aggregate of 100 million lives in the United States by the end of 2019.

• ***Highly scalable and low investment manufacturing with digital refills.*** Our low manufacturing and assembly costs allow us to scale to meet demand with minimal additional investment. With the launch of the gammaCore Sapphire, which uses RFID cards for refills, our gross margins are expected to increase significantly. When the payers are in place, we have the capability to integrate our onboard Bluetooth technology with the payer systems to leverage a cloud-based refill delivery process, which we believe will enable greater efficiencies, further enhancing our gross margins.

• ***Potential for rapid label expansion in headache and regulatory approval in additional indications.*** The safety profile of gammaCore enabled us to utilize the de novo regulatory pathway through which the FDA established a new therapeutic category: External Vagus Nerve Stimulator for Headache (21 CFR 882-5892). Through the 510(k) pathway, we received clearance for our gammaCore therapy for the acute treatment of pain associated with migraine in adults in January 2018, and clearance for the prevention of cluster headaches in December 2018. We believe a similar regulatory pathway may be available to us for additional indications in headache, including the prevention of migraine, the expansion of our label to include adolescents, and the treatment of post-traumatic headaches. We also anticipate seeking regulatory authorization to commercialize our therapy in rheumatological conditions through similar pathways.

\* \* \*

• ***Highly experienced management team.*** Our management team includes a diverse group of executives with significant experience in senior positions in the pharmaceutical and medical device industries, including positions at Pfizer, Merck, Novartis, Stryker and Zimmer Biomet. Members of our team have been involved in the launch and marketing of products including Motrin, Celebrex, and the

migraine drugs Axert and Maxalt. Our team's pharmaceutical experience in clinical development, sales, marketing and reimbursement, and its medical device experience in research, development and regulatory affairs, allow us to pursue our strategy and growth plans.

200.    Also like the Offering Documents, the 2018 10-K discussed the size and scope of the Company's market and the opportunity to fill in the void in those markets created by a supposed paucity of other effective migraine treatments. The 2018 10-K stated the following, in relevant part:

> ***Current Acute Migraine Treatments and Their Limitations.*** Triptan medications, or Triptans, are a family of tryptamine-based drugs first sold in the 1990s, which account for approximately 80% of the acute treatments prescribed for migraine. Triptans are sold in oral, nasal, and subcutaneous formulations. Through their binding to specific seratonin receptor subgroups, Triptans cause constriction of blood vessels in the outer covering of the brain, or the meninges. This vasoconstrictive activity may also affect blood vessels in other areas of the body, including the heart, which accounts for important risks associated with their use, and labeling limitations on the frequency of their use.
>
> Other less commonly prescribed acute migraine treatments include ergotamines and analgesics, including non-steroidal anti-inflammatory drugs, or NSAIDs, acetaminophen and antiemetics. Dihydroergotamine, or DHE, is a grain fungus derivative that, like triptans, is a potent vasoconstrictor. DHE has been used for more than 50 years for the treatment of migraine, but modern physicians rarely prescribe it because of significant side effects. More specifically, ergotamines and triptans are both vasoconstrictors with labels citing the risk of their use in migraine sufferers with risk factors for cardiovascular disease. Opioids are often dispensed for migraine attacks in emergency departments; however, in the treatment guidelines referenced by the National Institutes of Health, their use is not recommended for the acute treatment of migraine. Opioid use for migraine is associated with increased disability and health care utilization. The U.S. Centers for Disease Control and Prevention has recognized the growing issue of opioid misuse, abuse and addiction and officially classified prescription opioid abuse as an epidemic. Data from a 2009 study conducted by the American Migraine Prevalence and Prevention Study suggests that about 16% of migraine patients are current opioid users and 16% of those patients are likely dependent. Although there are more prescription therapies available for migraineurs than CH sufferers, according to the U.S. Pharmacist, a leading pharmacy publication, upwards of 60% of the migraine patient population has reported dissatisfaction with, or has contraindications to, the current standard of care treatments for migraine. These medications include triptans, ergotamines and anti-epileptic medications. Despite the fact that neurologists recognize the limited efficacy of, and the potential for

abuse associated with, opioids, they continue to be prescribed at high rates, particularly in emergency departments for the treatment of migraine. Many other primary headache conditions, and secondary headaches, such as post-traumatic headache, have proven refractory to pharmaceutical interventions, presenting a significant unmet need in the market.

\* \* \*

**Migraine Prophylaxis Market**

According to the U.S. Agency for Healthcare Research and Quality, only about 12% of adults with high frequency or chronic migraine take preventive medications. According to the American Migraine Foundation, medication side effects often limit the use of migraine medications.

***Currently Used Therapies for Migraine Prevention and Their Limitations.*** Prior to the approval of CGRP antibodies by the FDA, there were five products approved by the FDA for the prevention of migraine: anti-epileptic drugs, topiramate (Topamax) and valproic acid (Depakote), beta-blockers, propranolol (Inderal) and timolol (Blocadren), and BOTOX. BOTOX is the only product that has been approved by the FDA for the prevention of chronic migraine, and its label is limited to that subgroup. In all cases, these medications were first approved for other uses.

These current treatments are ineffective or inconvenient for some patients, and their use has been limited by issues with tolerability and side effects, including cognitive impairment, nausea, fatigue and sleep disturbance. Anti-epileptic drugs are also associated with poor pregnancy outcomes and fetal abnormalities, which is a concern for women of childbearing years. In clinical trials, these medications require four to six weeks of daily administration before most patients experience measurable clinical benefit. For example, BOTOX requires approximately 31 subcutaneous injections at various sites on the head and neck, repeated every 12 weeks. There are currently three antibodies to CGRP and its receptor approved by FDA for the prevention of migraine by Teva Pharmaceutical Industries Ltd., and Eli Lilly and Company, and by Amgen Inc., which is in a co-marketing partnership with Novartis International AG, approved by the FDA in May 2018. There are a number of medical devices that have been marketed for the treatment of migraine, including Cefaly and the Spring TMS device.

We believe there is a need for a new therapy that can either prevent migraines or reduce their severity to a level at which supplemental existing abortive therapies can provide relief as needed, with reduced side effects. Such a therapy could provide benefit for both patients on existing therapies and patients who have abandoned therapy.

201.   The 2018 10-K touted the Company's regulatory "clearance" and signified its intention to seek expansion into preventative treatment, stating the following:

**Migraine Prevention**

As previously described, the grant by FDA of our de novo submission resulted in a new Class II regulatory category: External Vagus Nerve Stimulator for Headache (21 CFR 882-5892). The establishment of this product category permits us to apply for label expansions through the 510(k) regulatory pathway utilizing our own product as the predicate. With the recent clearance of our label expansion to CH, it is now our intention to seek the expansion of our label for the prevention of migraine. As described below, we have conducted, and continue to conduct clinical studies to support this indication.

202.   Like the Offering Documents, the 2018 10-K also publicized "key elements" of electroCore's strategy to develop into a market leader. Among those "key elements" were existing agreements with commercial payors which had supposedly secured reimbursement for gammaCore as a pharmacy benefit for tens of millions of patients. The Offering Documents stated:

Our goal is to be a leader in bioelectronic medicine by using our proprietary non-invasive VNS platform therapy to deliver better patient outcomes. The key elements of our strategy include:

- ***Drive acceptance of our gammaCore products as a leading headache therapy.*** We are establishing gammaCore as a first-line treatment option for neurologists when treating CH patients, who have few alternative treatment options available to them. We are continuing to leverage this position as we expand into the broader headache market for acute migraine treatment. We are working towards gaining additional FDA-clearances in multiple headache indications including migraine prevention, post traumatic headache, and migraine in adolescents. Receipt of each of these FDA-clearances will provide us with greater access into the headache market.

- ***Drive reimbursement of our therapy.*** We have been and are actively engaging with over 50 national and regional commercial insurance payers, as well as the Federal Supply Schedule in the United States, with the goal of securing reimbursement coverage. These efforts in 2018 culminated with the initiation of estimated coverage for approximately 53 million lives in the United States as of January 2019. With continuing payer discussions regarding up to an additional 90 million lives, we are seeking to expand the number of covered lives in the United States to an aggregate of 75 million

by the beginning of the third quarter of 2019, and to an aggregate of 100 million by the end of 2019, although there can be no assurance of success.

- **_Build a leading commercial presence._** We have established a robust commercial capacity, including a specialty distribution channel with a patient-focused support service to quickly onboard patients and manage payer interactions. Following our initial public offering, in the third quarter of 2018 we expanded our direct sales force to 32 people who are targeting the 6,400 leading neurology specialists and headache centers that originate the substantial majority of new prescriptions for severe headache patients in the United States.

203.    Further, regarding the commercialization of gammaCore, the 2018 10-K provided details on electroCore's "commercial strategy" and electroCore's existing agreements with commercial payors which had supposedly secured reimbursement for gammaCore as a pharmacy or medical benefit for approximately 53 million patients which the Company emphasized was to expand in the near future. The 2018 10-K stated:

As of January 2019, we have agreements or arrangements with commercial payers, one pharmacy benefit manager, or PBM and the Federal Supply Schedule, or FSS, that we estimate provide for reimbursement for gammaCore as either a pharmacy benefit or medical benefit for approximately 53 million lives in the United States. Although there can be no assurance of success, our payer access team is negotiating contracts with several additional insurance plans and PBMs covering an additional approximately 90 million commercial lives, and in clinical review with plans covering an additional approximately 50 million lives.

* * *

**Strategy and Implementation**

Our commercial strategy has been focused on the following priorities:

- **_Drive advocacy of gammaCore as a leading headache therapy._** Our advocacy strategy has been to establish gammaCore as a preferred treatment option in CH, and expand from that position into migraine. The core of this strategy is our physician outreach, professional education, peer reviewed publications, and participation in national and global professional society meetings.

- **_Drive reimbursement of our therapy._** Our strategy to secure reimbursement for gammaCore therapy across the majority of CH and migraine patients

began 18 months prior to market entry, in early 2016, when we initiated pipeline presentations across the largest two-dozen commercial payers in the United States. Based on the gammaCore monthly prescription model, many payers indicated that we should advocate for reimbursement as a pharmacy benefit, especially among the pharmacy benefit management, or PBM, companies. It is typical for reimbursement from PBMs to come by way of rebate agreements, requiring the company to offer significant discounts, in the form of rebate payments, in return for gaining access to the PBM's population of potential patients. Preferred positioning within the PBM's system, which typically entails the product having the fewest restrictions and the lowest patient co-pay amounts, generally is provided to the companies providing the deepest discounts. It has been our strategy to identify the necessary rebate levels to gain the appropriate access. In addition, we are providing co-pay assistance to minimize the financial burden placed on the patient for filling the prescription. While we have been successful in negotiating several coverage agreements, and are currently in ongoing pharmacy benefit coverage negotiations with other payers, we have encountered some other payers, including the Federal government, who prefer to provide coverage for our therapy as a medical benefit. For these payers, negotiating reimbursement for gammaCore requires a different approach, in which the rebates are smaller or in some cases non-existent, and our support of the patient's co-pay may need to be significantly higher, as medical benefit deductibles are typically much higher than those for pharmacy products.

In 2018, our strategy focused on engaging, negotiating and securing agreements with the commercial payers and the components of the Federal government programs covering men and women aged 18 to 55, as these payers cover approximately 92% of patients experiencing migraines and cluster headaches. Payers in the United States typically make coverage and reimbursement decisions with respect to new therapies based on three key factors: the strength of the therapy's clinical data; observed patient demand; and the absolute and relative costs of the therapy.

* * *

- **Build a leading commercial presence.** To establish a leading commercial presence, we adopted a four-part strategy comprised of: identifying the leading prescribing physicians providing secondary care to complex headache patients; engaging experienced sales specialists with deep knowledge of the target space and the physician community with whom they will be engaged; implementing a distribution platform and specialty hub supporting all aspects of the physician-patient-payer relationship, and creating a marketing engagement program to ensure that patients and physicians are aware of the value proposition of gammaCore.

204.    The statements in ¶¶ 198-203 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) gammaCore did not benefit from competitive advantages over other treatments for episodic cluster headaches and migraines; (2) in fact, electroCore faced fierce competition due to increasing pricing pressure and a lack of insurance coverage; (3) gammaCore was typically not thought of as a primary treatment for migraines, but rather as a supplemental treatment; (4) electroCore's agreements and relationships with insurance companies and commercial payors were limited; (5) the Company was struggling to obtain insurance coverage for gammaCore; (6) therefore, since reimbursement would be difficult, physicians were hesitant to prescribe gammaCore; (7) the Company was forced to devote substantial resources to help physicians regarding insurance coverage, thereby increasing electroCore's expenses; (8) electroCore unsuccessfully relied on promotional programs such as its voucher program to increase sales when those programs were actually having a negative effect on reimbursement by payors, causing the appearance that gammaCore was utilized more often than it was; (9) the foregoing programs required considerable cash outlays which hastened the Company's burn rate, rendering electroCore's commercial approach untenable; (10) the Company's clinical data was insufficient to demonstrate that gammaCore was effective and safe for migraine prevention and the FDA had raised concerns to that effect; and (11) consequently, the Company's 510(k) application to the FDA for the use of gammaCore for migraine prevention was unlikely to be approved without, at least, additional data. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

***April 30, 2019 Proxy Statement***

205.     On April 30, 2019, the Company filed its 2019 Proxy Statement. Defendants Amato, J. Errico, Atieh, Colucci, Cox, T. Errico, Moody, Ondra, and Tullis, solicited the 2019 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

206.     The 2019 Proxy Statement called for shareholder approval of, among other things: (1) the election of three directors; (2) ratification of the Company's independent auditor; and (3) the approval of the Company's 2019 Employee Stock Purchase Plan, which provided for an initial 300,000 shares of Company common stock to be available for eligible employees to purchase Company stock.

207.     The 2019 Proxy Statement stated, regarding the Company's Code of Conduct, that the Company has "adopted a Code of Business Conduct and Ethics, or the Code of Conduct, applicable to all of our employees, executive officers and directors" and that further states that "[t]he nominating and governance committee of our Board is responsible for overseeing the Code of Conduct and must approve any waivers of the Code of Conduct for employees, executive officers and directors."

208.     The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as multiple Individual Defendants, *inter alia*, allowed false and misleading statements to be issued to the investing public, and failed to comply with laws and regulations, or conduct business in an honest and ethical manner.

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

209.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards that "ensure that the interests of executives are closely aligned with those of shareholders," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

210.    The 2019 Proxy Statement also failed to disclose, *inter alia*: (1) gammaCore did not benefit from competitive advantages over other treatments for episodic cluster headaches and migraines; (2) in fact, electroCore faced fierce competition due to increasing pricing pressure and a lack of insurance coverage; (3) gammaCore was typically not thought of as a primary treatment for migraines, but rather as a supplemental treatment; (4) electroCore's agreements and relationships with insurance companies and commercial payors were limited; (5) the Company was struggling to obtain insurance coverage for gammaCore; (6) therefore, since reimbursement would be difficult, physicians were hesitant to prescribe gammaCore; (7) the Company was forced to devote substantial resources to help physicians regarding insurance coverage, thereby increasing electroCore's expenses; (8) electroCore unsuccessfully relied on promotional programs such as its voucher program to increase sales when such programs were having a negative effect on reimbursement by payors, causing the appearance that gammaCore was utilized more often than it was; (9) the foregoing programs required considerable cash outlays which hastened the Company's burn rate, rendering electroCore's commercial approach untenable; (10) the Company's clinical data was insufficient to demonstrate that gammaCore was effective and safe for migraine prevention and the FDA had raised concerns to that effect; (11) consequently, the Company's 510(k) application to the FDA for the use of gammaCore for migraine prevention was unlikely to be approved without, at least, additional data; and (12) the Company's senior leadership including,

but not limited to the CEO and CFO, were prepared to step away from electroCore shortly following the IPO. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Gradually Emerges as False and Misleading Statements Continue

*May 14, 2019 Press Release and Earnings Call*

211.    On May 14, 2019, the Company issued a press release which was attached to a current report filed with the SEC on Form 8-K signed by Defendant Posner and held an earnings call to discuss its financial results for the first fiscal quarter of 2019. The press release stated, in pertinent part:

> **First Quarter 2019 and Recent Highlights**
>
> • Nearly 2,200 prescribing physicians through the first quarter of 2019, up from approximately 1,800 in the fourth quarter of 2018
> • Total prescriptions written were approximately 6,100 in the first quarter of 2019 compared to 5,800 in the fourth quarter of 2018
> • Prescriptions dispensed were approximately 3,000 in in the first quarter of 2019, relatively unchanged from the fourth quarter of 2018
>
> &#42; &#42; &#42;
>
> "Our first quarter 2019 operating results are only beginning to reflect the positive steps that we took during the second half of last year," said Frank Amato, chief executive officer of electroCore. "Notably, ***our first quarter results do not fully reflect the positive impact of new payers that were implemented during the quarter, including CVS Caremark, Highmark, and the Veteran's Administration or Partners for Coverage, our expanded free goods program. We are establishing a new approach to headache therapy and recognize that our growth will be gated by the realities of carving a new market position in a lucrative but crowded therapeutic segment. gammaCore Sapphire has a unique position as the only non-invasive vagus nerve stimulation device approved by FDA to treat both migraine and cluster headache, and the only therapy of any type approved for the prevention of cluster headache***. We are working with payers to help them decide how to pay for a product that can be reimbursed through multiple pathways. We are pleased by our accomplishments to date and believe our market penetration will increase as the awareness of our therapy expands and when we add further payer coverage."

**First Quarter 2019 Financial Results**

For the quarter ended March 31, 2019, electroCore reported net sales of $410,000, as compared to $81,000 in the first quarter of 2018 and $368,000 in the fourth quarter of 2018. The increase in revenue reflects increased sales of gammaCore Sapphire.

Total operating expenses for first quarter of 2019 were $14.5 million, as compared to $9.1 million for the first quarter of 2018. The increase in operating expense was driven primarily by increased sales and marketing expenses, as well as an increase in stock-based compensation.

Operating loss for the first quarter of 2019 was $14.2 million as compared to an operating loss of $9.1 million in the first quarter of 2018.

Cash and cash equivalents and marketable securities at March 31, 2019 totaled $52.4 million, as compared to $68.6 million at December 31, 2018. Th*e **net cash burn of $16.2 million for the quarter ended March 31, 2019***, included working capital uses of cash due to a $1.6 million increase in inventory and approximately $2.1 million of payments related to 2018 accrued compensation.

(Emphasis added.)

212.    Although the Company disclosed lackluster financial results, a supposed delay of encouraging commercial payor results, and recognized that the therapeutic segment was "crowded," much of the truth was yet to be revealed to investors. Moreover, during the earnings call that the Company held that same day, regarding, *inter alia,* electroCore's "momentum," Defendant Amato stated the following, in relevant part:

As you know in 2018, we took a number of key steps to build out our commercial infrastructure to support the launch of gammaCore. It positioned the Company for growth in 2019. Our quarter-over-quarter growth in total prescriptions, refilled prescriptions and prescribing physicians demonstrated that demand for our therapy was strong throughout 2018 and that the business model of delivering our therapy in monthly prescriptions is robust.

Toady [sic], I'm pleased to report that the first quarter of 2019 has continued that trend. We have sustained momentum among patients, physicians and payers. During the first quarter, we had key milestones across all the leading indicators of our business including total prescription with March coming in with our best monthly total to-date. This increase in prescriptions written is a result of writing by existing prescribers as well as newly prescribing physicians. At the end of 2018,

we reported that we have reached over 1,800 patients who had read at least one prescription.

By the end of Q1, we have seen prescriptions from 2,170 physicians cumulatively since the launch of product. 332 new physicians prescribed gammaCore from the first time in Q1, which speaks to the comfort that physicians have in prescribing a therapy that is safe and had minus systematic side effects no drug interactions. During the quarter, we expanded our free goods program Partners for Coverage our PFC, which was initiated in Q4. Under this program, our specialty pharmacy partner Asembia dispenses gammaCore or one month of therapy patients to qualify.

* * *

Shifting now from the free good program to the progress we've made in gaining the reimbursement, throughout the first quarter we began to see the anticipated increase in reimbursed prescriptions being processed to both CVS Caremark and the Federal Supply Schedule or FSS. In order to actualize the revenue potential of the FSS contract within the military channel, we spent and continued to spent [sic] a considerable amount of our effort working through distribution logistics to bring each hospital and military treatments facility online.

Each of the targeted 33 individual military treatment facilities and 80 Veterans Administration centers require an understanding of how its local distribution process works. To that end, our commercial team brought 20 military facilities on line that purchased product during the first quarter. Similarly, regarding patients covered by the three large PBM networks, CVS Caremark, Express Scripts and OptumRx, more than 5,000 prescriptions have been filed -- filled under the Partners for Coverage program, the prior voucher program or through patient self-pay.

The majority of these prescriptions await approval of the required prior authorization and represent potential reimbursement. We are starting to see the log jam break with a better than 250% increased from Q4 to Q1 in reimbursed prescriptions seen through the CVS Caremark agreement. We are still in the early days of the implementation of the CVS Caremark agreement. So, the increases are over a small but now growing base and we are encouraged by the trend. Importantly, the April numbers show a continuation of this growth.

With this in mind in the first quarter 2019, we were able to realize GAAP revenue of approximately $410,000, about 11% growth over the fourth quarter. We also dispensed in the U.S. an additional 1.6 million worth of gammaCore prescriptions through the ongoing promotional programs, which include both our Partners for Coverage program and co-pay assistance.

In total, the potential demand product sales value of gammaCore prescriptions dispensed during the first quarter of 2019 was similar to what we reported to the fourth quarter of 2018 were approximately $2 million. As more of these

promotional descriptions get reimbursed, we expect to see it reflected in GAAP revenue and will continue the revenue ramp that we are anticipating this year.

* * *

In the PBM channel, our agreement with CVS Caremark went into effect in January of this year. ***gammaCore is currently a non preferred branded product requiring a co-pay currently covered to our co-pay assistance that the prescription be written by a neurologist and the patient has failed at least three other prescribed medications***.

To date, over 1,600 CVS Caremark patients have been prescribed gammaCore. Nearly 1100 prior authorization requests have been sent to prescribing physicians for which 800 responses have been received in return. ***Because the paper work is not only still correctly we are working closely with neurologist to whole new ability to provide required information to CVS Caremark accurately***.

(Emphasis added.)

213.    Additionally, Defendant Amato admitted on the call that a standard that "universalizes our codes for inclusion in all pharmacopoeia" had not been established until 2019 and that First Databank, which was the largest database used by commercial payors, did not consent, until 2019, to "build[] a third database which [would] include all the codes for [gammaCore]"

214.    Also on the call, Defendant Posner disclosed that as a result of the "new coverage decision" revenues for 2019 would not appear until later in the year. Defendant Posner stated the following:

Due largely to the timing of new coverage decision, on the part of CVS Caremark, the Federal Supply schedule and others that commence reimbursement in the first quarter of 2019 as well as continued growth in unique prescribers and the ongoing conversion of promotional scripts to be reimbursed, we continue to anticipate that revenue for 2019 we'll be back-end weighted.

Specific to the second quarter for example, we have already seen a growth in the number of product requisitions from the VA and DoD facilities in April that was almost as much as all of the first quarter. Of course, the growth is over very small base, but it speaks to the multiple factors that are all converging on a growing opportunity.

215. On this news, the price of the Company's stock fell $1.58 per share, or approximately 29.64%, from $5.33 per share at the close of trading on May 14, 2019, to $3.75 per share at the close of trading on May 15, 2019.

**May 15, 2019 Form 10-Q**

216. On May 15, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Amato and Posner and contained SOX certifications signed by Defendants Amato and Posner attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

217. The 1Q19 10-Q stated the following regarding the Company's voucher program:

In February 2018, we began a formal physician training program engaging key opinion leaders throughout the United States to highlight the clinical evidence and benefits of gammaCore for the acute treatment of pain associated with both migraine and episodic cluster headache and to train their colleagues on how to prescribe gammaCore. Concurrently, we began a program that provided these trained physicians with vouchers, which allowed them to provide new patients with a one-time 31-day prescription at no charge to the patient. This voucher program was implemented with three goals: to provide patients therapy at no charge; to demonstrate to physicians the benefits of gammaCore therapy; and to prompt U.S. commercial payers to provide pharmacy benefit coverage for the product as a result of their observation of patient demand for the therapy. This program has resulted in significant increases in prescriptions for gammaCore and has prompted negotiations with numerous commercial payers, resulting in non-preferred medical and pharmacy reimbursement in approximately 10 million lives and medical exception coverage for an additional 30 million pharmacy benefit lives in the first quarter of 2019.

218. The foregoing statement was materially false and misleading and it failed to disclose material facts necessary to make the statements not false and misleading including that electroCore unsuccessfully relied on promotional programs such as its voucher program to

increase sales when such programs were actually having a negative effect on reimbursement by payors, causing the appearance that gammaCore was utilized more often than it was.

### *May 29, 2019 Press Release*

219.    Approximately two weeks later, on May 29, 2019, the Company issued a press release which was attached to a current report filed with the SEC on Form 8-K signed by Defendant Posner. The press release stated, in pertinent part:

> electroCore, Inc. (Nasdaq: ECOR), a commercial-stage bioelectronic medicine company, today announced that management and the Board of Directors are making significant adjustments to the deployment of personnel and resources across the organization. The effort is intended to focus the Company on currently available and near-term revenue opportunities and on clinical programs specifically designed to expand the gammaCore™ product labeling. To achieve this goal the Company is right-sizing across its organization, including its field sales force and clinical operations. The Company will focus its resources on high-value geographic and other sales territories where the current prescriber base and regional payer coverage are most concentrated including:
>
>> i. Regional payers, some of whom have recently amended their policies to permit reimbursement for electroCore's principal offering, gammaCore™.
>> ii. The Veterans Administration and Department of Defense, covered under the Federal Supply Schedule contract secured by the Company in December 2018.
>> iii. The United Kingdom, where a recent Innovative Technology Program cluster headache treatment award offers the Company the potential to generate revenue.
>> iv. Other potential revenue opportunities in the pain management field.
>
> The Company will continue to pursue relationships with pharmacy benefit managers.

220.    As for some additional effects that the revised commercial plan would have on the Company, the press release revealed, in relevant part:

> ***electroCore also announced that it is scaling back its clinical development program as part of the redeployment of resources. Changes include the postponement of several planned studies while focusing on opportunities to broaden the approved indications for gammaCore™ products. The Company is also reducing its medical affairs activities consistent with its revised commercial plan***.

The broad-based redeployment and expense reduction plan will be fully implemented by the end of the second quarter of 2019. Beginning in the third quarter of 2019, the Company's average quarterly cash burn is expected to be less than $7.0 million through 2020, compared to its previously reported expected burn of $12.0 million per quarter. ***Inclusive of one-time charges of approximately $350,000 associated with implementation of this plan, the Company's second quarter cash burn is expected to be between $11.0 million and $11.5 million***. This expense reduction plan is further bolstered by the decision of the Company's independent directors to forgo all cash compensation for their Board service effective June 1, 2019, as well as the willingness of Frank Amato, the Company's chief executive officer, to voluntarily accept a 10% reduction in base annual cash compensation for the next 12 months, which is expected to be offset by a grant of restricted stock units valued at $50,000 on June 7, 2019, the date of the Company's annual meeting of stockholders.

221.    The press release disclosed the following regarding the Company's cash flow:

On March 31, 2019, the Company had $52.4 million of cash, cash equivalents and marketable securities. Based on its current cash resources and cash flow projections, and after giving effect to the anticipated cost savings from the comprehensive redeployment and cost reduction plan, electroCore believes that it will have adequate resources to fund its operations into the beginning of 2021.

222.    The press release quoted Defendant Amato, stating:

Mr. Frank Amato said, "Although we are cognizant of the pain and disappointment that may be experienced by those employees who will be separating from the Company as we reduce our workforce from 91 to 55 positions under this program, the Board and management believe the adjustments to the expenditure of our resources are necessary as we respond to evolving market forces in the headache field. As was shared on our most recent earnings call, there are several promising commercial channels capable of providing significant sales acceleration.

(Emphasis added.)

223.    On this news, the price of the Company's stock fell $0.11 per share, or over 5.3%, from $2.06 per share at the close of trading on May 29, 2019, to $1.95 per share at the close of trading on May 30, 2019. Over the following two trading days, the price of the Company's stock continued to fall an additional $0.30 per share, or nearly 15.4%, from $1.95 per share at the close of trading on May 30, 2019, to $1.65 per share at the close of trading on June 3, 2019.

*August 13, 2019 Press Release and Earnings Call*

224.     On August 13, 2019, the Company issued a press release which was attached to a current report filed with the SEC on Form 8-K signed by Defendant Posner and held an earnings call to discuss its financial results for the second fiscal quarter of 2019. The press release stated, in pertinent part.

**Second Quarter 2019 and Recent Highlights**

* * *

• 510(k) premarket notification submission for migraine prevention accepted by FDA

* * *

"The comprehensive redeployment and cost reduction plan that we announced in May has made electroCore a more efficient organization capable of quickly reacting to changes in the rapidly evolving headache market. We believe our sharpened focus on our existing or near-term revenue generating opportunities is prudent *while we continue to work to add the support of larger payers, which can take some time to bring across the finish line*. We believe our non-invasive vagus nerve stimulation technology has applicability across a broad range of high-value indications, and we expect that we will be able to sustain or accelerate our current growth trajectory," Mr. Amato concluded.

**Migraine Prevention Label Expansion Update**

In July 2019, the FDA accepted for review electroCore's 510(k) premarket notification for a new indication for use of gammaCore for the prevention of migraine. Accordingly, the company continues to enroll subjects in the Premium 2 clinical trial to support the label expansion into migraine prevention, and to support the commercialization of gammaCore as a migraine prevention therapy should the indication receive FDA clearance. The company expects to receive the FDA's decision by the end of 2019 and to complete enrollment in Premium 2 in the first half of 2020.

**Second Quarter 2019 Financial Results**

For the quarter ended June 30, 2019, electroCore reported net sales of approximately $623,000, as compared to approximately $410,000 in the first quarter of 2019. The increase in revenue reflects increased sales in the United States and the United Kingdom.

87

Total operating expenses for second quarter of 2019 were approximately $12.7 million, as compared to approximately $16.4 million for the second quarter of 2018. The decrease was due primarily to a reduction in SG&A expense, which declined to approximately $9.4 million in the second quarter 2019 from approximately $12.0 million for the comparable period in 2018, primarily driven by a reduction in both marketing related costs and stock compensation expense. ***The current quarter included restructuring charges of approximately $850,000 in connection with the comprehensive deployment and cost reduction plan announced in May.***

Operating loss for the second quarter of 2019 was $12.4 million as compared to an operating loss of $16.2 million in the second quarter of 2018.

Cash and cash equivalents and marketable securities at June 30, 2019 totaled approximately $41.1 million, as compared to approximately $68.6 million at December 31, 2018. Net cash burn for the quarter ended June 30, 2019 was approximately $11.2 million, consistent with the previously stated expectation included in the Company's May press release announcing the comprehensive redeployment and cost reduction plan. Net cash burn for the quarter ended March 31, 2019 was approximately $16.2 million.

As previously disclosed, beginning with the third quarter of 2019, the Company anticipates that its average quarterly cash burn will be less than $7 million at least through 2020. ***electroCore anticipates that its cash burn for some quarters may exceed $7 million due to working capital adjustments and one-time payments.*** Based on its current cash resources, and revenue and expense forecasts, electroCore believes that it will have adequate resources to fund its operations into the beginning of 2021.

(Emphasis added.)

225.    During the earnings call that the Company held that same day, Defendant Amato stated the following, in relevant part, regarding, *inter alia*, the limits of electroCore's agreement CVS:

So, the gating factor for us remains getting rebate contracts in place with PBMs and also with local payers through, right now, Prime Therapeutics as the PBM for about half of those Blue's lives that I mentioned earlier. ***The CVS Caremark agreement we have in place still requires physicians to fill our paperwork, and prioritize for a majority of the patients within that plan, not all of them. We have offered contract with CVS Caremark and have been gone back and forth with our contract -- in various terms we've offered.***

*So once that gets completed and is loaded that will likely get us access to a large majority of those folks without having to have paperwork filled out by the physician. It still might be a prior off, but it's electronic in the way it's dispensed to the physician today*. And then with respect to the other plans, we have Express Scripts, Prime Therapeutics, and other plans in the United States that we're currently negotiating with.

In addition to that, we are *following-up on legislation that was published on opioids last year, which state directly that neuromodulation therapies could be a good alternative to opioids in the marketplace and CMS is looking at technologies, like ours, to code that in a way that patients will get access to the therapy without having to go through the traditional durable medical equipment pathway that most of these CMS improvements naturally follow*.

226.   On this news, the price of the Company's stock fell $0.17 per share, or over 10%, from $1.56 per share at the close of trading on August 13, 2019, to $1.39 per share at the close of trading on August 14, 2019.

### September 25, 2019 Press Release

227.   More than one month later, on September 25, 2019, the Company issued a press release titled "electroCore Provides Update on 510(k) Submission Seeking Expanded Indication for gammaCore™." The press release stated, in pertinent part:

electroCore, Inc. (Nasdaq: ECOR, or the "Company"), a commercial-stage bioelectronic medicine company, today announced that the U.S. Food and Drug Administration ("FDA") has requested more information and analysis of the clinical data included in the Company's premarket notification, or "510(k)" submission, seeking an expanded indication for the use of gammaCore™ (noninvasive vagus nerve stimulator). Although the Company has 180 days to respond to FDA's request, the Company expects to meet with the FDA in the fourth quarter to discuss the information request. gammaCore™ is currently FDA-cleared for the treatment of pain associated with episodic cluster headache and migraine headache, and adjunctive use for the prevention of cluster headache.

The data submitted in the 510(k) include the results of the Premium 1 study, a randomized, double-blind, sham-controlled trial of gammaCore™ . . . .

"We look forward to meeting soon with the FDA to discuss our 510(k) submission and are committed to working with the agency to address their questions as quickly as possible," said Tony Fiorino, Chief Medical Officer of electroCore. "Meanwhile

we continue to recruit subjects into the Premium 2 study which we anticipate will further define the clinical utility of gammaCore™ in the migraine space."

228.    On this news, the price of the Company's stock fell $0.79 per share, or over 23%, from $3.36 per share at the close of trading on September 24, 2019, to $2.57 per share at the close of trading on September 25, 2019.

## DAMAGES TO ELECTROCORE

229.    As a direct and proximate result of the Individual Defendants' conduct, electroCore has lost and will continue to lose and expend many millions of dollars.

230.    Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Action filed against the Individual Defendants including the Company, its former CEO, former CFO, its CFO, and many of its current and former directors, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

231.    Additionally, these expenditures include, but are not limited to, compensation and benefits paid to the Individual Defendants, as detailed herein, who breached their fiduciary duties to the Company. This compensation additionally includes, but is not limited to, the $800,000 lump sum payment paid to Defendant Amato pursuant to his Separation and Release Agreement and the $581,000 lump sum payment paid to Defendant J. Errico pursuant to his Separation and Release Agreement.

232.    As a direct and proximate result of the Individual Defendants' conduct, electroCore has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

233.   Plaintiff brings this action derivatively and for the benefit of electroCore to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of electroCore, unjust enrichment, waste of corporate assets, and violations the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Section 11(f) of the Securities Act and 21D of the Exchange Act.

234.   electroCore is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

235.   Plaintiff is, and has been at all relevant times, a shareholder of electroCore. Plaintiff will adequately and fairly represent the interests of electroCore in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

236.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

237.   A pre-suit demand on the Board of electroCore is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine Individual Defendants: J. Errico, Atieh, T. Errico, Moody, Ondra (collectively, the "Director-Defendants"), along with non-parties Daniel S. Goldberger ("Goldberger"), Peter Cuneo, Thomas Patton, and John Gandolfo (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

238.   Demand is excused as to all of the Director-Defendants because each one of them face, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

239.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

240.   The Director-Defendants knew of the falsity of the misleading statements at the time they were made. Prior to the IPO and throughout the Relevant Period, as detailed by CW7, the Company conducted weekly meetings that were attended by Board meetings during which Liebler, the Company's Senior Vice President of Neurology, would present updates on the trial intended to expand the use of gammaCore to preventative treatment. Moreover, electroCore is a very small company with only 64 employees at the time of the IPO and after increasing for a few months downsized to 51 employees in May 2019. Defendants J. Errico and T. Errico co-founded the Company in 2005. Defendant Moody has been on the Board since March 2013. These facts support an inference of scienter as to the Director-Defendants who are charged with overseeing the Company's affairs. It is reasonable to infer that the Director-Defendants, as Board members of electroCore, all must have had knowledge of information pertaining to electroCore's core operations and the material events giving rise to these claims. The Director-Defendants all served on the Board either leading up to the IPO and signed the Registration Statement and/or during the

Relevant Period and signed the 2018 10-K. Thus, they each knew of the falsity of the statements and misleading omissions detailed herein at the time such statements were made, and further failed to exercise or recklessly disregarded their duty of oversight to stop or correct such misleading statements and omissions with respect to electroCore's core operations.

241.    Additional reasons that demand on Defendant J. Errico is futile follow. Defendant J. Errico co-founded electroCore with his uncle, Defendant T. Errico, and non-parties Theofilos and Staats and has served as a Company director since 2005. Previously, he served as the Company's CSO from July 2016 until June 2019, as the Company's CEO from January 2010 until July 2016, and as Chairman of the Board from March 2013 until June 2018. Thus, as the Company admits, he is a non-independent director. electroCore has provided Defendant J. Errico with his principal occupation, and he receives handsome compensation, including approximately $1.5 million and over $1.1 million during the 2019 and 2018 Fiscal Years, respectively. As a long-time trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant J. Errico signed, and thus personally made the false and misleading statements in the Registration Statement and the 2018 10-K. Moreover, Defendant J. Errico is a defendant in the Securities Class Action. His insider sales, which yielded approximately $535,270 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant J. Errico breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile, and, therefore, excused.

242.     Additional reasons that demand on Defendant Atieh is futile follow. Defendant Atieh served as a Company director since the IPO in June 2018. He also serves as the Chair of the Audit Committee. Defendant Atieh has received and continues to receive compensation for his role as a director as described herein. As a long-time trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Atieh signed, and thus personally made the false and misleading statements in the 2018 10-K. Moreover, Defendant Atieh is a defendant in the Securities Class Action. For these reasons, too, Defendant Atieh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile, and, therefore, excused.

243.     Additional reasons that demand on Defendant T. Errico is futile follow. Defendant T. Errico co-founded the Company with his nephew, Defendant J. Errico and non-parties Theofilos and Staats and has served as a Company director since September 2005. He also serves as a member of the Compensation Committee and as a member of the Nominating and Governance Committee. Defendant T. Errico has received and continues to receive compensation for his role as a director as described herein. As a long-time trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant T. Errico signed, and thus personally made the false and misleading statements in the Registration Statement and the 2018 10-K. Moreover, Defendant T.

Errico is a defendant in the Securities Class Action. For these reasons, too, Defendant T. Errico breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile, and, therefore, excused.

244.   Additional reasons that demand on Defendant Moody is futile follow. Defendant Moody has served as a Company director since March 2013. He also serves as a member of the Compensation Committee. Defendant Moody has received and continues to receive compensation for his role as a director as described herein. As a long-time trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Moody signed, and thus personally made the false and misleading statements in the Registration Statement and the 2018 10-K. Moreover, Defendant Moody is a defendant in the Securities Class Action. For these reasons, too, Defendant Moody breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile, and, therefore, excused.

245.   Additional reasons that demand on Defendant Ondra is futile follow. Defendant Ondra has served as a Company director since the IPO in June 2018. He also serves as a member of the Nominating and Governance Committee. Defendant Ondra has received and continues to receive compensation for his role as a director as described herein. As a long-time trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ondra signed, and thus

personally made the false and misleading statements in the 2018 10-K. Moreover, Defendant Ondra is a defendant in the Securities Class Action. For these reasons, too, Defendant Ondra breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile, and, therefore, excused.

246.    Non-party Goldberger is the current CEO of electroCore and has served in such capacity and as a Company director since October 2019. Thus, as the Company admits, he is a non-independent director. The Company provides Goldberger with his principal occupation, and he has received and continues to receive handsome compensation, including his annual base salary of $500,000. He is also entitled to receive a bonus at the Board's discretion of up to 50% of his annual base salary and healthcare benefits and was granted a stock option to purchase shares having an aggregate value of $1,200,000 on October 1, 2019 and 215,053 restricted stock units. As the Company provides Goldberger with his primary occupation and means of livelihood, it is unlikely he would entertain a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining his compensation and evaluating his continued employment with electroCore. Thus, demand upon non-party Goldberger is futile as well.

247.    Additional reasons that demand on the Board is futile follow.

248.    Among others, Defendant Atieh served as a member of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, Defendant Atieh was responsible for overseeing, among other things, "(1) the integrity of the financial statements of the Company; (2) the independent auditor's qualifications and independence; (3) the performance of the Company's internal audit function and independent auditors; and (4) the compliance by the Company with legal and regulatory requirements"[4] Defendant Atieh was also responsible for

---

[4]    electroCore, Inc. Charter of the Audit Committee of the Board of Directors,

reviewing and discussing with management the Company's disclosures in its periodic reports with the SEC and earnings press releases. Defendant Atieh failed to ensure the integrity of the Company's accounting and financial reporting processes and internal controls, as he was charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading statements with the SEC. Thus, Defendant Atieh breached his fiduciary duties, is not disinterested, and demand is excused as to him.

249.    Defendants T. Errico and Ondra (the "Nominating and Governance Committee Defendants") served as members of the Nominating and Governance Committee during the Relevant Period. Pursuant to the 2019 Proxy Statement, the Nominating and Governance Committee Defendants are responsible for, among other things, overseeing the Code of Conduct. The Nominating and Governance Committee Defendants failed to ensure compliance with the Code of Conduct. Thus, the Nominating and Governance Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

250.    In addition, given their extensive and relevant education and experience in the healthcare industry, as detailed herein, Defendants T. Errico and Ondra, fully understood the true likelihood for FDA approving gammaCore without, at least, first requesting additional data. For example, *inter alia*, Defendant T. Errico is Chief of the Division of Spine Surgery in the Department of Orthopedics at NYU Langone Medical Center and NYU Langone Orthopedic Hospital. He is also a tenured Professor of Orthopedic and Neurological Surgery at NYU School of Medicine. Defendant Ondra is Chief Executive Officer of North Star Healthcare Consulting, a healthcare technology consulting company. Moreover, Defendant Ondra is a board-certified

---

https://investor.electrocore.com/static-files/d65ef324-fd5c-45b3-824a-e5b4f5dd021f. Last visited February 25, 2021.

neurosurgeon and was a Professor of Neurosurgery and Residency Program Director at Northwestern University's Feinberg School of Medicine from 1996 to 2009. Defendant Ondra graduated from Rush Medical College in Chicago with a Doctor of Medicine Despite the foregoing, Defendants T. Errico and Ondra failed to correct the materially false and misleading statements and omissions issued throughout the Relevant Period, as detailed herein, and, as a result, face a substantial likelihood of liability. Thus, Defendants T. Errico and Ondra breached their fiduciary duties, are not disinterested, and demand is excused.

251.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, in addition to their directorships at electroCore, Defendants J. Errico is T. Errico's nephew and they not only co-founded the Company together but have previously co-founded other companies together including Spinecare, where they sat on the board of directors together, and where Defendant J. Errico served as CEO, until Spinecare was sold. Additionally, Defendants Moody and Rubin started working together approximately 24 years ago, as they were both employed as Senior Consultants at The Wilkerson Group during the same time period, with Defendant Moody working there from 1996 until 1999 and Defendant Rubin from 1997 until 2000. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

252.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

253. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for electroCore any part of the damages electroCore suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

254. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

255. The acts complained of herein constitute violations of fiduciary duties owed by electroCore's officers and directors, and these acts are incapable of ratification.

256. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers'

liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of electroCore. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of electroCore, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

257. If there is no directors' and officers' liability insurance, then the Directors will not cause electroCore to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

258. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Defendants Amato, Posner, J. Errico, Atieh, Colucci, Cox, T. Errico, Moody, Ondra, and Tullis for Violations of Section 14(a) of the Exchange Act**

259. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

260. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not

sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

261.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

262.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

263.    Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose, *inter alia*: (1) gammaCore did not benefit from competitive advantages over other treatments for episodic cluster headaches and migraines; (2) in fact, electroCore faced fierce competition due to increasing pricing pressure and a lack of insurance coverage; (3) gammaCore was typically not thought of as a primary treatment for migraines, but rather as a supplemental treatment; (4) electroCore's agreements and relationships with insurance companies and commercial payors were limited; (5) the Company was struggling to obtain insurance coverage for gammaCore; (6) therefore, since reimbursement would be difficult, physicians were hesitant to

prescribe gammaCore; (7) the Company was forced to devote substantial resources to help physicians regarding insurance coverage, thereby increasing electroCore's expenses; (8) electroCore unsuccessfully relied on promotional programs such as its voucher program to increase sales when such programs were actually having a negative effect on reimbursement by payors, causing the appearance that gammaCore was utilized more often than it was; (9) the foregoing programs required considerable cash outlays which hastened the Company's burn rate, rendering electroCore's commercial approach untenable; (10) the Company's clinical data was insufficient to demonstrate that gammaCore was effective and safe for migraine prevention and the FDA had raised concerns to that effect; (11) consequently, the Company's 510(k) application to the FDA for the use of gammaCore for migraine prevention was unlikely to be approved without, at least, additional data; and (12) the Company's senior leadership including, but not limited to the CEO and CFO, were prepared to step away from electroCore shortly following the IPO. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

264.    The false and misleading elements of the 2019 Proxy Statement led to the election of Defendants Amato, Atieh, and Ondra, which allowed the Individual Defendants to breach or continue to breach their fiduciary duties to electroCore.

265.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

266.     The 2019 Proxy Statement also made reference to the Company's Code of Conduct. The Code of Conduct required the Company and Individual Defendants to abide by relevant laws and statutes, make accurate and non-misleading public disclosures, and conduct business in an honest and ethical manner. By issuing false and misleading statements to the investing public, the Individual Defendants violated the Code of Conduct. The 2019 Proxy Statement failed to disclose these violations and also failed to disclose that the terms of the Code of Conduct were being violated.

267.     In the exercise of reasonable care, the Defendants Amato, Posner, J. Errico, Atieh, Colucci, Cox, T. Errico, Moody, Ondra, and Tullis should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and the approval of the 2019 Employee Stock Purchase Plan.

268.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

269.     Plaintiff, on behalf of electroCore, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

270.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

271.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of electroCore's business and affairs.

272.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

273.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of electroCore.

274.     In breach of their fiduciary duties owed to electroCore, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*: (1) gammaCore did not benefit from competitive advantages over other treatments for episodic cluster headaches and migraines; (2) in fact, electroCore faced fierce competition due to increasing pricing pressure and a lack of insurance coverage; (3) gammaCore was typically not thought of as a primary treatment for migraines, but rather as a supplemental treatment; (4) electroCore's agreements and relationships with insurance companies and commercial payors were limited; (5) the Company was struggling to obtain insurance coverage for gammaCore; (6) therefore, since reimbursement would be difficult, physicians were hesitant to prescribe gammaCore; (7) the Company was forced to devote substantial resources to help physicians regarding insurance coverage, thereby increasing electroCore's expenses; (8) electroCore unsuccessfully relied on promotional programs such as its voucher program to increase sales when such programs were actually having a negative effect on reimbursement by payors, causing the appearance that gammaCore was utilized more often than it was; (9) the foregoing programs required considerable cash outlays which hastened the Company's burn rate, rendering electroCore's commercial approach untenable; (10) the Company's clinical data was insufficient to demonstrate that gammaCore was effective and safe for migraine

prevention and the FDA had raised concerns to that effect; (11) consequently, the Company's 510(k) application to the FDA for the use of gammaCore for migraine prevention was unlikely to be approved without, at least, additional data; and (12) the Company's senior leadership including, but not limited to the CEO and CFO, were prepared to step away from electroCore shortly following the IPO. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

275.   The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

276.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

277.   In breach of their fiduciary duties, one of the Individual Defendants engaged in improper insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact.

278.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of electroCore's securities, and disguising insider transactions.

279.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of electroCore's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

280.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

281.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, electroCore has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

282.     Plaintiff on behalf of electroCore has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

283.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

284.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, electroCore.

285.    The Individual Defendants either benefitted financially from the improper conduct, including through insider sales, or unjustly received lucrative bonuses, stock options, or similar compensation from electroCore that was tied to the performance or artificially inflated valuation of electroCore, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

286.    Plaintiff, as a shareholder and a representative of electroCore, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and due to their wrongful conduct and breach of their fiduciary and contractual duties.

287.    Plaintiff on behalf of electroCore has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

288.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

289.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

290.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused electroCore to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its services.

291.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

292.     Plaintiff on behalf of electroCore has no adequate remedy at law.

## FIFTH CLAIM

**Against the Defendants Amato, Vraniak, J. Errico, T. Errico, Cox, Atieh, Colucci, Moody, Ondra, Ross, Rubin, and Tullis for Contribution Under Section 11(f) of the Securities Act**

293.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

294.     As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of electroCore shareholders in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

295.     Federal law provides electroCore with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

296.     The plaintiffs in the Securities Class Action allege that the Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

297.     electroCore is the registrant for the IPO. The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

298.     As issuer of the shares, electroCore is strictly liable to plaintiff and the class for the misstatements and omissions alleged in the Securities Class Action.

299.     The plaintiff in the Securities Class Action alleges that none of Defendants Amato, Vraniak, J. Errico, T. Errico, Cox, Atieh, Colucci, Moody, Ondra, Ross, Rubin, Tullis named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

300.     Defendants Amato, Vraniak, J. Errico, T. Errico, Cox, Atieh, Colucci, Moody, Ondra, Ross, Rubin, Tullis, because of their positions of control and authority as officers and directors of electroCore, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of electroCore, including the wrongful acts complained of herein and in the Securities Class Action.

301.     Accordingly, Defendants Amato, Vraniak, J. Errico, T. Errico, Cox, Atieh, Colucci, Moody, Ondra, Ross, Rubin, Tullis are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which creates a private right of action for contribution, which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

302.     As such, electroCore is entitled to receive all appropriate contribution or indemnification from Defendants Amato, Vraniak, J. Errico, T. Errico, Cox, Atieh, Colucci, Moody, Ondra, Ross, Rubin, Tullis.

## SIXTH CLAIM

**Against Defendants Amato, Vraniak, Posner, J. Errico, T. Errico, Cox, Atieh, Colucci, Moody, Ondra, and Tullis for Contribution Under Sections 10(b) and 21D of the Exchange Act**

303.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

304.     electroCore, along with Defendants Amato, Vraniak, Posner, J. Errico, T. Errico, Cox, Atieh, Colucci, Moody, Ondra, and Tullis are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Amato, Vraniak,

Posner, J. Errico, T. Errico, Cox, Atieh, Colucci, Moody, Ondra, and Tullis' willful and/or reckless violations of their obligations as officers and/or directors of electroCore, and Individual Defendants' aiding and abetting thereof.

305.    Defendants Amato, Vraniak, Posner, J. Errico, T. Errico, Cox, Atieh, Colucci, Moody, Ondra, and Tullis, because of their positions of control and authority as officers and/or directors of electroCore, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of electroCore, including the wrongful acts complained of herein and in the Securities Class Action.

306.    Accordingly, Defendants Amato, Vraniak, Posner, J. Errico, T. Errico, Cox, Atieh, Colucci, Moody, Ondra, and Tullis are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

307.    As such, electroCore is entitled to receive all appropriate contribution or indemnification from Defendants Amato, Vraniak, Posner, J. Errico, T. Errico, Cox, Atieh, Colucci, Moody, Ondra, and Tullis.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of electroCore, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to electroCore;

(c)    Determining and awarding to electroCore the damages sustained by it as a

110

result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing electroCore and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect electroCore and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of electroCore to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding electroCore restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

111

Dated: March 4, 2021                            Respectfully submitted,

                                                **THE ROSEN LAW FIRM, P.A.**

                                                By: /s/ Laurence M. Rosen
                                                Laurence M. Rosen
                                                One Gateway Center, Suite 2600
                                                Newark, NJ 07102
                                                Telephone: (973) 313-1887
                                                Facsimile: (973) 833-0399
                                                Email: lrosen@rosenlegal.com

                                                **KARON LLC**
                                                Daniel R. Karon
                                                700 W. St. Clair Ave., Ste. 200
                                                Cleveland, OH 44113
                                                Telephone: (216) 622-1851
                                                Email: dkaron@karonllc.com

                                                **DANIEL P. BUTTAFUOCO & ASSOCIATES, PLLC**
                                                Daniel P. Buttafuoco
                                                144 Woodbury Rd.
                                                Woodbury, NY 11797
                                                Telephone: (516) 746-8100
                                                Facsimile: (516) 746-6473

                                                *Counsel for Plaintiff*

## **VERIFICATION**

I,   Richard Maltz   am   a   plaintiff   in   the   within   action.   I   have
reviewed the allegations made   in   this   shareholder   derivative   complaint,   know   the
contents thereof, and authorize   its   filing.   To   those   allegations   of   which   I   have
personal   knowledge,   I believe those allegations   to   be   true.   As   to   those   allegations   of
which   I   do   not   have personal knowledge, I rely upon my counsel and their investigation and
believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ⎩th
day of ___March___ , 2021.

Richard Maltz